UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 2:07-0329 |
| v. ) | |
| ) | |
| ) | |
| DAILY GAZETTE COMPANY, ) | |
| ) | |
| and ) | |
| ) | |
| MEDIANEWS GROUP, INC., ) | |
| ) | |
| Defendants. ) | |
| ) | |

## FINAL JUDGMENT

WHEREAS, Plaintiff, United States of America, filed its Complaint on May 22, 2007, the United States and Defendants, Daily Gazette Company and MediaNews Group, Inc., by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, Defendants agree to be bound by the provisions of this Final Judgment pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt adoption of certain procedures and prohibitions by Defendants to assure that competition is not substantially lessened;

AND WHEREAS, the United States requires Defendants to agree to certain procedures and prohibitions for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, Defendants have represented to the United States that the actions required below can and will be made and that Defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED AND DECREED:

## I. Jurisdiction

This Court has jurisdiction over the subject matter of and each of the parties to this action. The Complaint states a claim upon which relief may be granted against Defendants under Section 7 of the Clayton Act, as amended (15 U.S.C. § 18), and Sections 1 and 2 of the Sherman Act, as amended (15 U.S.C. §§ 1 & 2).

## II. Definitions

As used in this Final Judgment:

A. "*Charleston Daily Mail*" means the Daily Newspaper of that name distributed in the Charleston, West Virginia Area.

B. "*Charleston Gazette*" means the Daily Newspaper of that name distributed in the Charleston, West Virginia Area.

C. "Charleston Newspapers" means the unincorporated joint venture operating under the laws of West Virginia, with its principal place of business in Charleston, West Virginia, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint

ventures, and their shareholders, directors, officers, managers, agents, and employees.

D. "Charleston Newspapers Holdings, L.P." means the Delaware Limited Partnership formed on May 7, 2004.

E. "Charleston, West Virginia Area" means Kanawha and Putnam Counties in West Virginia.

F. "Daily Newspaper" means a print publication which is published no fewer than five days per week and in which a substantial portion of the content is devoted to the dissemination of news and editorial opinion.

G. "Editorial Content" means the news, feature, and opinion content of, and the format, dress, makeup, and design of, a Daily Newspaper.

H. "Failing Firm" means a firm that has satisfied all of the conditions stated in the U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines as applied by the Department of Justice and/or federal courts to newspapers published in a joint operating agreement under the Newspaper Preservation Act, 15 U.S.C. §§ 1801-1804.

I. "Final Judgment" includes the following agreements attached as Exhibit A: Amended and Restated Limited Partnership Agreement for Charleston Newspapers Holdings L.P; Amended and Restated Operating Agreement of Daily Gazette Holding Company, LLC; Second Amended and Restated Joint Operating Agreement; the Put/Call Agreement; and the Charleston Newspapers Holdings L.P. Warrant to Purchase Class B Limited Partnership Units Initially Constituting a 20% Percentage Interest.

J. "Gazette Company" means defendant Daily Gazette Company, a privately-held corporation organized and existing under the laws of the State of West Virginia, with its principal

3

place of business in Charleston, West Virginia, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their shareholders, directors, officers, managers, agents, and employees. Without limiting the foregoing, Gazette Company shall include Charleston Newspapers.

K. "Intellectual Property of the *Charleston Daily Mail*" includes the masthead, trademarks, copyrights, trade names, service names and service marks of the *Charleston Daily Mail*; its subscriber lists and advertiser lists; print and electronic archives; associated web sites and URLs (including "dailymail.com"); and all legal rights associated with these assets.

L. "MediaNews Group" means defendant MediaNews Group, Inc., a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Denver, Colorado, its successors and assigns, and their shareholders, subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees. Without limiting the foregoing, MediaNews Group shall include Charleston Publishing Company.

M. "Person" means any natural person, corporate entity, partnership, joint venture, association, government entity, trust, or other business or legal entity, whether private or governmental.

N. "Publication" means all activities associated with the business of offering a Daily Newspaper to the public as a commercial endeavor, including but not limited to, editing, writing, printing, circulating, operating, marketing, and distributing such Daily Newspapers and selling advertisements and promotions therein.

O. "Relating to" or "Relates to" means in whole or in part constituting, containing,

concerning, discussing, describing, analyzing, identifying, or stating.

      P. "United States" means the Department of Justice, Antitrust Division.

      Q. The terms "and" and "or" have both conjunctive and disjunctive meanings.

## III. Applicability

This Final Judgment applies to Gazette Company and MediaNews Group, as defined above, and all other persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

## IV. Required And Prohibited Conduct

      A.    (1) Within 5 business days after the entry of this Final Judgment, Gazette Company and MediaNews Group shall enter into, and abide by the terms of, the Amended and Restated Limited Partnership Agreement for Charleston Newspapers Holdings L.P.; the Amended and Restated Operating Agreement of Daily Gazette Holding Company, LLC; the Second Amended and Restated Joint Operating Agreement; the Put/Call Agreement; and the Charleston Newspapers Holdings L.P. Warrant to Purchase Class B Limited Partnership Units Initially Constituting a 20% Percentage Interest, which are incorporated into this Final Judgment and attached hereto as Exhibit A. Gazette Company and MediaNews Group shall operate Charleston Newspapers, Charleston Newspapers Holdings L.P., the *Charleston Gazette* and the *Charleston Daily Mail* in accordance with the terms of the agreements in Exhibit A. No agreement in Exhibit A may be modified, amended, superseded or terminated without the prior written approval of the United States for the term of the Final Judgment. Upon entering into the contracts in Exhibit A, any existing agreements between Gazette Company and MediaNews Group relating to the Publication of any Daily Newspaper in Charleston, West Virginia, other

5

than those contained in Exhibit A, shall be void and shall not be enforced thereafter. Except as expressly authorized by the agreements in Exhibit A, Gazette Company and MediaNews Group shall not directly or indirectly enter into any agreement for the term of this Final Judgment that relates to the Publication of any Daily Newspaper in Charleston, West Virginia, other than agreements entered into with third parties in the ordinary course of business, without the prior written consent of the United States.

(2) Defendants shall not, without the prior written consent of the United States, pledge or otherwise offer as security or collateral, the assets comprising the Intellectual Property of the *Charleston Daily Mail*, in whole or in part, for credit or other consideration, to a greater extent than such assets were pledged or offered as security or collateral as of December 11, 2009.

B. The *Charleston Daily Mail* shall continue to be published as a Daily Newspaper. The publication of the *Charleston Daily Mail* as a Daily Newspaper shall not be terminated unless it is a Failing Firm and the United States has given its prior written approval, which approval shall not be unreasonably withheld. Prior to receiving written approval from the United States to terminate publication of the *Charleston Daily Mail* as a Daily Newspaper, Gazette Company and MediaNews Group may not establish a termination date for the *Charleston Daily Mail*. The United States shall, within 90 days after Defendants have substantially complied with requests for information by the United States pursuant to Section VI of this Final Judgment (unless such deadline is altered by mutual agreement of the parties), provide notice to the Defendants stating whether Defendants have established to the satisfaction of the United States that the *Charleston Daily Mail* is a Failing Firm. Disputes regarding the application of the provisions of this Section IV(B) may be submitted to the Court for resolution.

C. If during the term of this Final Judgment the *Charleston Daily Mail* shall cease publication as a Daily Newspaper, or the operating agreement between Defendants governing Charleston Newspapers is dissolved or terminated, or Charleston Newspapers Holdings, L.P. is dissolved or terminated (collectively referred to as "Termination Events"), ownership of the Intellectual Property of the *Charleston Daily Mail* shall, after the prior satisfaction of the claims of all creditors of Charleston Newspapers Holdings, L.P. in accordance with the provisions of Section 7.3 of the Amended and Restated Limited Partnership Agreement for Charleston Newspapers Holdings, L.P., immediately be transferred to MediaNews Group at no cost. Within ninety days prior to the occurrence of any of the Termination Events, Gazette Company shall hire, subject to the approval of the United States, an appraiser experienced in the newspaper industry to perform an assessment of the fair market value, separately, of each asset comprising the Intellectual Property of the *Charleston Daily Mail*. To the extent the valuations determine that any assets comprising the Intellectual Property of the *Charleston Daily Mail* may be freely disposed of by Gazette Company under the terms of Section 7.8 of the United Bank Loan Agreement or the equivalent provision of any future credit agreement, Gazette Company shall transfer those assets to MediaNews Group (or its assignee) at no cost. In the event Gazette Company is unable to transfer immediately all or some of the assets comprising the Intellectual Property of the *Charleston Daily Mail* due to any security interest or lien held on those assets by any creditor, Gazette Company shall use its good faith efforts to (1) persuade any such creditor to release the security interest or lien on those assets; (2) assist any third party seeking such a release; or (3) transfer the assets as soon as possible in the next fiscal year (to the extent permissible under the United Bank Loan Agreement or any future credit agreement). Any assets

that are released by the creditors shall be transferred to MediaNews Group (or its assignee) at no cost. In the event that the *Charleston Daily Mail*'s print and electronic archives are not transferred to MediaNews Group, Charleston Newspapers will grant to MediaNews Group (or its assignee) a royalty-free license to use the *Charleston Daily Mail*'s print and electronic archives for the sole purpose of continuing to publish the *Charleston Daily Mail* for so long as MediaNews Group (or its assignee) publishes the *Charleston Daily Mail* as a Daily Newspaper in Charleston. Except as expressly authorized by this Final Judgment, Gazette Company shall not directly or indirectly transfer to any other Person the ownership of some or all of the Intellectual Property of the *Charleston Daily Mail* without the prior written consent of the United States. If during the term of this Final Judgment the ownership of some or all of the Intellectual Property of the *Charleston Daily Mail* is transferred from Gazette Company to any other Person, Gazette Company shall not reacquire any part of the Intellectual Property of the *Charleston Daily Mail* during the term of this Final Judgment. Transfer of title to the Intellectual Property of the *Charleston Daily Mail* by Gazette Company shall be made free and clear of any liens or other encumbrances to the free transfer of title by the acquirer (including but not limited to rights of first refusal).

D. The Editorial Content of the *Charleston Daily Mail* shall be determined solely by MediaNews Group and the staff of the *Charleston Daily Mail*. The Editorial Content of the *Charleston Gazette* shall be determined solely by Gazette Company and the staff of the *Charleston Gazette*. Gazette Company shall not, directly or indirectly, take any action to influence the Editorial Content of the *Charleston Daily Mail*, nor shall MediaNews Group, directly or indirectly, take any action to influence the Editorial Content of the *Charleston*

8

*Gazette*.  Gazette Company and MediaNews Group shall not enter into any agreement limiting the separate and independent determination of the Editorial Content of their respective Daily Newspapers.

E.  Gazette Company and MediaNews Group shall not take any action with the intent to cause the *Charleston Daily Mail* to become a Failing Firm.  Neither Gazette Company nor MediaNews Group shall discriminate against, or cause Charleston Newspapers to discriminate against, the *Charleston Daily Mail* in performing circulation sales or advertising sales activities.

F.  Commencing no later than thirty (30) days after the entry of this Final Judgment and continuing for a period of no less than six (6) months thereafter, Defendants shall cause Charleston Newspapers to offer the *Charleston Daily Mail* at a discount of no less than fifty (50) percent off the regular subscription price to all new subscribers.  Charleston Newspapers shall inform prospective new subscribers of this discount in any subscription solicitation efforts that it undertakes (including telemarketing, door-to-door, and kiosk sales efforts; single-copy promotions; and solicitations on the *Charleston Daily Mail's* website).  During this period, Charleston Newspapers may not extend this same discount, or any greater discount, to subscribers of the *Charleston Gazette*.  For purposes of this paragraph IV(F), a new subscriber is any person who purchases a subscription to the *Charleston Daily Mail* and who has not subscribed to the daily *Charleston Daily Mail* or the daily *Charleston Gazette* within sixty (60) days of making such purchase.

## V. Affidavits

Within sixty (60) calendar days of the entry of this Final Judgment in this matter, and every year thereafter until the expiration of this Final Judgment, Defendants shall deliver to the

9

United States an affidavit as to the fact and manner of their compliance with Section IV of this Final Judgment. Assuming the information set forth in the affidavit is true and complete, any objection by the United States to information provided by Defendants, including limitation on information, shall be made within fourteen (14) calendar days of receipt of such affidavit.

## VI. Compliance Inspection

A. For the purposes of determining or securing compliance with this Final Judgment, or of determining whether the Final Judgment should be modified or vacated, or determining whether to consent to any proposed agreement per Section IV(A), or whether to approve a termination of publication per Section IV(B), or whether to consent to any transfer per Section IV(C), and subject to any legally recognized privilege, from time to time authorized representatives of the United States, including consultants and other persons retained by the United States, shall, upon written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to defendants, be permitted:

(1) access during defendants' office hours to inspect and copy, or at the option of the United States, to require defendants to provide hard copy or electronic copies of, all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of defendants, relating to any matters contained in this Final Judgment; and

(2) to interview, either informally or on the record, defendants' officers, employees, or agents, who may have their individual counsel present, regarding such matters. The interviews shall be subject to the reasonable convenience of the

interviewee and without restraint or interference by defendants.

B. Upon the written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, defendants shall submit written reports or response to written interrogatories, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested.

C. No information or documents obtained by the means provided in this Section shall be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D. If at the time information or documents are furnished by defendants to the United States, defendants represent and identify in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," then the United States shall give defendants ten (10) calendar days notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

## VII. Retention of Jurisdiction and Expiration of Final Judgment

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, including the agreements of the parties attached hereto as Exhibit A, to modify any of their provisions, to enforce compliance, and to punish violations of their

provisions. Unless this Court grants an extension, this Final Judgment shall expire five (5) years from the date of its entry. The expiration of this Final Judgment shall not trigger the termination of the agreements contained in Exhibit A. After the expiration of this Final Judgment, the agreements contained in Exhibit A will be governed by their own terms.

## VIII. **Public Interest Determination**

Entry of this Final Judgment is in the public interest. The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment and the Competitive Impact Statement. No public comments were received. Based upon the record before the Court, entry of this Final Judgment is in the public interest.


DATED: July 19, 2010


_____
John T. Copenhaver, Jr.
United States District Judge

SEEN AND APPROVED BY:

PLAINTIFF UNITED STATES
OF AMERICA

By: s/Stephen M. Horn
Assistant United States Attorney
Attorney for the United States (WVSB 1788)
P.O. Box 1713
Charleston, WV 25326
Telephone: 304-345-2200
Fax: 304-347-5443
E-mail: steve.horn@usdoj.gov

By: s/Bennett J. Matelson
United States Department of Justice
Antitrust Division
Litigation III
450 5th Street, NW, Suite 4000
Washington, DC 20530
Telephone: 202-616-5871
Fax: 202-514-7308
E-mail: Bennett.Matelson@usdoj.gov

DEFENDANT DAILY GAZETTE
COMPANY

By: s/Lee H. Simowitz
Baker & Hostetler LLP
1050 Connecticut Avenue, NW
Suite 1100
Washington, DC 20036
Telephone: 202-861-1608
Fax: 202-861-1783
E-mail: lsimowitz@bakerlaw.com

By: s/Benjamin L. Bailey
Bailey & Glasser LLP
209 Capitol Street
Charleston, WV 25301
Telephone: 304-345-6555
E-Mail: bbailey@baileyglasser.com

DEFENDANT MEDIANEWS
GROUP, INC.

By: s/Alan L. Marx
King & Ballow
1100 Union Street Plaza
315 Union Street
Nashville, TN 37201
Telephone: 615-726-5455
E-mail: amarx@kingballow.com

By: s/John R. Hoblitzell
(WVSB #1746)
Kay Casto & Chaney PLLC
1500 Chase Tower
707 Virginia Street
Charleston, WV 25301
Telephone: 304-345-8900
E-Mail: jhoblitzell@kaycasto.com

# EXHIBIT A

14

AMENDED AND RESTATED

LIMITED PARTNERSHIP AGREEMENT

FOR

CHARLESTON NEWSPAPERS HOLDINGS, L.P.

A DELAWARE LIMITED PARTNERSHIP

_____, 2009

THIS AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT is
entered into as of _____, 2009 by and among Daily Gazette Holding Company, LLC, a
Delaware limited liability company ("DGHC") and Charleston Publishing Company, a Delaware
corporation ("CPC").

## RECITALS

WHEREAS, the Partnership was formed on May 7, 2004 in connection with the
transactions contemplated by that certain Master Restructuring and Purchase Agreement (the
"Master Restructuring Agreement") entered into on May 7, 2004, by Daily Gazette Company,
MediaNews Group, Inc. (now known as Affiliated Media, Inc.) ("MNG"), CPC and the Joint
Venture;

WHEREAS, the Partnership has managed and will, pursuant to the Second Amended and
Restated Joint Venture Agreement dated as of even date herewith (the "JOA"), continue to
manage the business and affairs of the Joint Venture; and

WHEREAS, DGHC and CPC desire to amend various provisions of the Limited
Partnership Agreement dated May 7, 2004 (the "Prior Partnership Agreement"), by and among
DGHC, CPC and ABRY/Charleston, Inc. to restate it in its entirety and to supplement it, as
herein provided;

NOW, THEREFORE, the parties agree as follows:

## ARTICLE I

## Definitions

1.1     Definitions. As used herein, the following terms shall have the following
meanings:

1.1.1 _Act_: the Delaware Revised Uniform Limited Partnership Act, 6 Del. Code, as it may be amended from time to time, and any successor to such Act.

1.1.2 _Affiliate_: with respect to any Person, any other Person directly or indirectly controlling or controlled by such Person or under direct or indirect common control with such Person.

1.1.3 _Adjusted Capital Account_: with respect to any Partner, the deficit balance, if any, in such Partner's Capital Account as of the end of the relevant Fiscal Year or other period, after giving effect to the following adjustments:

(i) Crediting to such Capital Account any amounts that such Partner is obligated to restore to the Partnership pursuant to this Agreement or as otherwise described Treasury Regulations Section 1.704-1(b)(2)(ii)(_c_) or is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(ii) Debiting from such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(_d_)(_4_), 1.704-1(b)(2)(ii)(_d_)(_5_) and 1.704-1(b)(2)(ii)(_d_)(_6_).

The foregoing definition of Adjusted Capital Account is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(_d_) and shall be interpreted consistently therewith.

1.1.4 _Agreement_: this Amended and Restated Limited Partnership Agreement, as it may be amended from time to time.

1.1.5 _Capital Account_: with respect to any Partner, the account maintained for such Partner in accordance with the capital accounting rules of Section 704(b) of the Code and

2

the provisions of Treasury Regulations Section 1.704-1(b)(2)(iv). Subject to any contrary requirements of the Code and the Treasury Regulations issued thereunder, each Partner's Capital Account shall equal (1)(i) the amount set forth as such Partner's capital account as of the date hereof as set forth on Exhibit B; (ii) the amount of money which has been contributed by that Partner to the Partnership after the date hereof, if any; (ii) the fair market value, determined without regard to Code Section 7701(g) of the property, if any, which has been contributed by that Partner to the Partnership after the date hereof (net of any liabilities that are secured by such contributed property or that the Partnership or any other Partner is considered to assume under Code Section 752); (iii) allocations which have been made to that Partner of Net Profit and items of income and gain pursuant to Article V after the date hereof; and (iv) other additions which have been made in accordance with the Code after the date hereof, decreased by (2)(i) the amount of cash which has been distributed to that Partner by the Partnership after the date hereof; (ii) allocations which have been made to that Partner of Net Loss and items of loss and deduction pursuant to Article V after the date hereof; (iii) the fair market value, determined without regard to Code Section 7701(g), of any property which has been distributed to that Partner by the Partnership after the date hereof (net of any liabilities that are secured by such distributed property or that such Partner is considered to assume or take under Code Section 752); and (iv) other deductions which have been made in accordance with the Code after the date hereof.

1.1.6 Capital Contribution: with respect to any Partner, any cash or other property that such Partner has contributed to the capital of the Partnership pursuant to the terms of this Agreement.

1.1.7 <u>Certificate of Limited Partnership</u>: the certificate of limited partnership of the Partnership, as amended.

1.1.8 <u>Class A Limited Partner</u>: a Person owning Class A Limited Partner Units that has been admitted to the Partnership as a Limited Partner pursuant to the terms of this Agreement.

1.1.9 <u>Class A Limited Partnership Interest</u>: the Partnership Interest with respect to the Class A Limited Partner Units.

1.1.10 <u>Class A Limited Partner Unit</u>: any Partnership Unit having the rights and obligations specified in this Agreement with respect to a Class A Limited Partner Unit.

1.1.11 <u>Class B Limited Partner</u>: a Person owning Class B Limited Partner Units that has been admitted to the Partnership as a Limited Partner pursuant to the terms of this Agreement.

1.1.12 <u>Class B Limited Partner Unit</u>: any Partnership Unit having the rights and obligations specified in this Agreement with respect to a Class B Limited Partner Unit.

1.1.13 <u>Code</u>: the Internal Revenue Code of 1986, as amended.

1.1.14 <u>Depreciation</u>: with respect to each Fiscal Year, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such Fiscal Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be determined in the manner that is described in Treasury Regulations Section 1.704-1(b)(2)(iv)(*g*)(*3*) or Treasury Regulations Section 1.704-3(d)(2), as applicable.

1.1.15 <u>Fair Market Value of the Partnership</u>: has the meaning given such term in Section 5.2.3(b).

4

1.1.16 <u>Fiscal Year</u>: the calendar year or, in the case of the first and the last fiscal years, the fraction thereof commencing on the date on which the Partnership is formed under the Act or ending on the date on which the winding up of the Partnership is completed, as the case may be.

1.1.17 <u>General Partner</u>: DGHC and any successor General Partner.

1.1.18 <u>General Partner Unit</u>: any Partnership Unit having the rights and obligations specified in this Agreement with respect to a General Partner Unit.

1.1.19 <u>GP Board</u>: has the meaning given such term in Section 4.5.2.

1.1.20 <u>Gross Asset Value</u>: with respect to any asset, the asset's adjusted basis for Federal income tax purposes, except as follows:

(i)     The initial Gross Asset Value of any asset contributed by a Partner to the Partnership after the date hereof shall be the gross fair market value of such asset as determined by the contributing Partner and the General Partner;

(ii)     The Gross Asset Value of each Partnership asset shall be adjusted to equal its gross fair market value, as determined by the General Partner, as of the following times: (a) the acquisition of an additional interest in the Partnership by any new or existing Partner in exchange for more than a *de minimis* Capital Contribution; (b) the distribution by the Partnership to a Partner of more than a *de minimis* amount of Partnership property as consideration for an interest in the Partnership; and (c) the liquidation of the Partnership within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(*g*). However, the adjustments which are described in clauses (a) and (b) above shall be made only if the General Partner reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Partners in the Partnership;

5

(iii)     The Gross Asset Value of any Partnership asset distributed to any Partner shall be adjusted to equal the gross fair market value of such asset on the date of distribution, as determined by the distributee Partner and the General Partner; and

(iv)     The Gross Asset Value of each Partnership asset shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such asset pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(*m*) and Section 5.3.8. However, Gross Asset Value shall not be adjusted pursuant to this clause (iv) to the extent that an adjustment pursuant to clause (ii) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to clauses (i), (ii) or (iv) of this definition, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Profit and Net Loss.

1.1.21 <u>Indemnified Person</u>: has the meaning given such term in Section 4.7.

1.1.22 <u>JOA</u>: has the meaning given such term in the Recitals to this Agreement, as such agreement may be amended from time to time.

1.1.23 <u>Joint Venture</u>: Charleston Newspapers, an unincorporated West Virginia joint venture.

1.1.24 <u>Limited Partner</u>: any Class A Limited Partner or Class B Limited Partner.

1.1.25 <u>Limited Partner Unit</u>: any Class A Limited Partner Unit or Class B Limited Partner Unit.

1.1.26 <u>Mail</u>: The Charleston Daily Mail.

1.1.27 <u>MNG</u>: has the meaning given such term in the Recitals to this Agreement, and includes any successor or assign.

1.1.28 <u>Net Cumulative Profit</u>: with respect to a Partner, an amount equal to the excess, if any, of (i) the aggregate Net Profits and items of income and gain allocated to such Partner pursuant to Article V for all Fiscal Years (or other periods) after the date hereof, over (ii) the aggregate Net Loss and items of loss and deduction allocated to such Partner pursuant to Article V for all Fiscal Years (or other periods) after the date hereof.

1.1.29 <u>Net Profit and Net Loss</u>: with respect to each Fiscal Year or other period, an amount which is equal to the Partnership's taxable income or loss for such year or period, as determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction that are required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i)     Any income of the Partnership that is exempt from Federal income tax and not otherwise taken into account in computing Net Profit or Net Loss shall be added to such taxable income or loss;

(ii)     Any expenditures of the Partnership described in Code Section 705(a)(2)(B), or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(*i*), and which are not otherwise taken into account in computing Net Profit or Net Loss, shall be subtracted from such taxable income or loss;

(iii)     In the event the Gross Asset Value of any Partnership asset is adjusted pursuant to clause (ii) or (iii) of the definition of Gross Asset Value, the amount of such

adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Profit or Net Loss;

(iv) Gain or loss resulting from any disposition of Partnership property with respect to which gain or loss is recognized for Federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(v) In lieu of the depreciation, amortization and other cost recovery deductions that are taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period;

(vi) Notwithstanding anything to the contrary that may be contained in the definition of the terms "Net Profit" and "Net Loss," any items that are specially allocated pursuant to Section 5.3 or 5.4 hereof shall be excluded in computing Net Profit or Net Loss; and

(vii) For purposes of this Agreement, any deduction for a loss on a sale or exchange of Partnership property which is disallowed to the Partnership under Code Section 267(a)(1) or 707(b) shall be treated as a Code Section 705(a)(2)(B) expenditure.

The amounts of the items of Partnership income, gain, loss, or deduction available to be specially allocated pursuant to Section 5.3 or 5.4 shall be determined by applying rules analogous to those set forth in this definition of Net Profit and Net Loss.

1.1.30 Newspapers: The Charleston Gazette, The Saturday Gazette-Mail, The Sunday Gazette-Mail and the Mail collectively, and a "Newspaper" means any one of the Newspapers.

1.1.31 Nonrecourse Deductions: losses, deductions or Code Section 705(a)(2)(B) expenditures that are attributable to Nonrecourse Liabilities of the Partnership. The amount of

8

Nonrecourse Deductions for a Fiscal Year shall be determined in accordance with Treasury Regulations Section 1.704-2(c).

1.1.32 <u>Nonrecourse Liability</u>: has the meaning set forth in Treasury Regulations Sections 1.704-2(b)(3) and 1.752-1(a)(2).

1.1.33 <u>Partner</u>: any of the General Partner and the Limited Partners individually, and "Partners" means each of the General Partner and the Limited Partners collectively.

1.1.34 <u>Partner Nonrecourse Debt</u>: has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4).

1.1.35 <u>Partner Nonrecourse Debt Minimum Gain</u>: has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2). The amount of Partner Nonrecourse Debt Minimum Gain shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

1.1.36 <u>Partner Nonrecourse Deductions</u>: losses, deductions or Code Section 705(a)(2)(B) expenditures that are attributable to Partner Nonrecourse Debt. The amount of Partner Nonrecourse Deductions for a Fiscal Year shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(2).

1.1.37 <u>Partner Ratio Percentage</u>: with respect to any Class B Limited Partner, the percentage obtained by dividing the Percentage Interest of such Class B Limited Partner by the General Partner's Percentage Interest.

1.1.38 <u>Partnership</u>: Charleston Newspapers Holdings, L.P., a Delaware limited partnership.

1.1.39 <u>Partnership Interest</u>: means the entire ownership interest of a Partner in the Partnership at any particular time, including all of its rights and obligations hereunder and under the Act.

9

1.1.40 <u>Partnership Minimum Gain</u>: has the meaning set forth in Treasury Regulations Section 1.704-2(b)(2). The amount of Partnership Minimum Gain for a Fiscal Year shall be determined in accordance with Treasury Regulations Section 1.704-2(d).

1.1.41 <u>Percentage Interest</u>: with respect to any Class B Limited Partner and the General Partner, means the ratio of the number of Units held by such Partner divided by the total number of Class B Limited Partner Units and General Partner Units outstanding.

1.1.42 <u>Person</u>: means any individual, partnership, joint venture, association, corporation, trust, estate, limited liability company, limited liability partnership or any other legal entity.

1.1.43 <u>Put/Call Agreement</u>: a put/call agreement entered into by a Class B Limited Partner, DGHC and the Partnership in connection with the exercise by the Warrant Holder of its right to purchase Class B Limited Partner Units pursuant to the terms of the Warrant, in substantially the form attached to the Warrant as <u>Exhibit B</u> thereto.

1.1.44 <u>Regulatory Allocations</u>: has the meaning given such term in Section 5.4.

1.1.45 <u>Subsidiary</u>: means any Person (including the Joint Venture) that is controlled by the Partnership.

1.1.46 <u>Tax-Adjusted Percentage Interests</u>: with respect to any Class B Limited Partner, the percentage determined by dividing (i) such Class B Limited Partner's Percentage Interest by (ii) one (1) minus the Tax Rate; and with respect to the General Partner, the percentage determined as one (1) minus the Tax-Adjusted Percentage Interest of such Class B Limited Partner. By way of illustration, if such Class B Limited Partner's Percentage Interest is 6.42% and the Tax Rate is 40%, such Class B Limited Partner's Tax Adjusted Percentage Interest shall be 10.70% and the General Partner's Tax-Adjusted Percentage Interest shall be 89.30%.

10

1.1.47  Tax Distributions: distributions made pursuant to Section 5.1.2.

1.1.48  Tax Gross-Up Amount: has the meaning given such term in Section 5.2.3 (a)(ii)(4).

1.1.49  Tax Rate: the highest effective combined rate of federal, state and local income and franchise tax applicable to corporations doing business in Charleston, West Virginia.

1.1.50  Tax Shortfall: has the meaning given such term in Section 5.1.2(b).

1.1.51  Transfer: has the meaning given to such term in Section 6.1.1.

1.1.52  Transferee: any Person that acquires a Partnership Interest from a Partner in accordance with the provisions of this Agreement.

1.1.53  Treasury Regulations: the Income Tax Regulations that have been promulgated under the Code, as such regulations may be amended from time to time.

1.1.54  Unit: an undivided share of the interests in the Partnership of all the Partners, which include General Partner Units, Class A Limited Partner Units, and Class B Limited Partner Units, as set forth on Exhibit A attached hereto, as amended from time to time.

1.1.55  Value of the Partnership's Business: has the meaning given such term in Section 5.2.3.

1.1.56  Warrant: that certain warrant, dated as of even date herewith, granted to the Warrant Holder by the Partnership to purchase Class B Limited Partner Units.

1.1.57  Warrant Holder: CPC or any permitted transferee of the Warrant.

## ARTICLE II

### Formation of the Partnership

2.1  Formation.  The Partnership was formed as a Delaware limited partnership pursuant to the terms of the Act and the Prior Partnership Agreement. The rights and liabilities of

11

the Partners shall be determined pursuant to the Act and this Agreement. To the extent the rights or obligations of any Partner are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2    Partners. As of the date hereof, DGHC is the sole General Partner of the Partnership, CPC is the sole Class A Limited Partner of the Partnership and there is no Class B Limited Partner.

2.3    Name. The name of the Partnership is "Charleston Newspapers Holdings, L.P." The business of the Partnership may be conducted under that name or, upon compliance with applicable laws, any other name that the General Partner deems appropriate or advisable.

2.4    Purpose. The purposes of the Partnership shall be (i) to own, directly and indirectly, all the interests in the Joint Venture, (ii) to engage in the business, directly and indirectly, of owning, operating and managing newspaper properties, including managing the business and affairs of the Joint Venture in accordance with the JOA, (iii) to borrow or raise money, to guarantee the obligations of others, and to secure the payment thereof by mortgage upon or pledge of the whole or any part of the property of the Partnership, (iv) to exercise all rights, powers, privileges and other incidents of ownership or possession with respect to securities or other assets held or owned by the Partnership, and (v) to do any act and thing and to enter into any contract incidental to, or necessary, proper or advisable for, the accomplishment of such purposes as determined by the General Partner in its sole discretion, including without limitation, entering into the JOA, the Warrant and a Put/Call Agreement and performing thereunder.

12

2.5     Place of Business. The principal place of business of the Partnership is c/o Daily Gazette Company, 1001 Virginia Street, East, Charleston, West Virginia 25301, subject to change by the General Partner upon notice to all Partners.

2.6     Agent for Service of Process. The agent of the Partnership for service of process in Delaware is the Corporation Service Company, 2711 Centerville, Road, Suite 400, Wilmington, Delaware 19808, subject to replacement from time to time by direction of the General Partner.

2.7     Term. The term of the Partnership commenced on the date the Certificate of Limited Partnership was filed with the Secretary of State of the State of Delaware, and shall continue until June 30, 2024, unless sooner terminated as provided in this Agreement.

2.8     Tax Matters. The parties acknowledge that for income tax purposes, the Partnership shall be treated as the continuation of the Joint Venture following the deemed merger of the Joint Venture and the Partnership.

ARTICLE III

Capital of the Partnership

3.1     Transfers to Partnership. DGHC and CPC each made the transfers to the Partnership specified on Exhibit A and received the Units specified in Exhibit A.

3.2     Future Capital Contributions; Capital Assets.

3.2.1   The Limited Partners shall have no obligation to make any further contributions to the capital of the Partnership, subject to CPC's obligation to reimburse the Joint Venture for any expenses paid by the Joint Venture on behalf of CPC in accordance with the provisions of the JOA.

13

3.2.2  DGHC shall in the future make such additional contributions to the capital of the Partnership as shall be necessary in its reasonable judgment to (1) fund acquisitions of capital assets necessary for the business and operations of the Partnership and/or the Joint Venture; (2) fund acquisitions of capital assets necessary for the business and operations of the editorial departments of each of the Newspapers to the extent such editorial departments' tangible capital assets on the date hereof require supplementation or replacement, (3) provide the Partnership and the Joint Venture with adequate working capital, and (4) ensure that the Partnership has adequate funds to make on a timely basis the cash distributions to CPC contemplated by Section V J (1) through (3) of the JOA, provided this is not intended to impose any greater obligation on the General Partner than is imposed on general partners generally under applicable law. The General Partner shall not have any personal liability for the repayment of the Capital Contributions of any other Partner; provided that the General Partner shall promptly return to the Partnership or to the Partner or Partners entitled thereto any distributions received by the General Partner in excess of those to which the General Partner is entitled under this Agreement.

3.3     Interest on Capital Contributions. No interest shall be paid by the Partnership on Capital Contributions.

3.4     Liability Limited to Capital. Except as otherwise provided under applicable law, the liability of a Limited Partner shall be limited to the total amount of Capital Contributions which such Limited Partner has made or is required to make pursuant to Section 3.1 hereof, and the Limited Partners shall have no further personal liability to contribute money to or in respect of the liabilities or obligations of the Partnership, nor shall the Limited Partners, as such, be personally liable for any obligation of the Partnership. A Limited Partner may, under certain

circumstances, be required by law to return to the Partnership, for the benefit of the Partnership's creditors, amounts previously distributed. No Limited Partner shall be obligated by this Agreement to pay those distributions to or for the account of the Partnership or any creditor of the Partnership. However, if any court of competent jurisdiction holds that, notwithstanding the provisions of this Agreement, a Limited Partner must return or pay over any part of those distributions, the obligation shall be that of such Limited Partner alone and not of any other Partner. Any payment returned to the Partnership by a Partner or made directly by a Partner to a creditor of the Partnership shall be deemed a Capital Contribution by such Partner.

3.5     Withdrawal of Capital. A Partner shall not be entitled to withdraw any part of its Capital Contribution or to receive any distribution from the Partnership, except as provided in this Agreement or the JOA.

## ARTICLE IV

### Management of the Partnership

4.1     General Partner. DGHC shall serve as the General Partner of the Partnership.

4.2     Partnership Powers. In furtherance of its purposes, the Partnership is hereby authorized to enter into any kind of lawful activity and to enter into, perform and carry out contracts of any kind in connection with the purposes of the Partnership.

4.3     Authority, Responsibilities and Powers of General Partner. Subject to Section 4.5.2 hereof, the General Partner shall have complete authority over and exclusive control and management of the business and affairs of the Partnership and all of the rights, powers and privileges of partners of a general partnership and of general partners of a limited partnership under the laws of the State of Delaware. The General Partner shall devote such time to the Partnership as it may reasonably deem to be required for the achievement of its purposes. In

15

connection with such management, the General Partner (i) may delegate such general or specific authority to the officers and employees of the Partnership and its Affiliates with respect to the business and day-to-day operations of the Partnership and its Affiliates as it may from time to time consider desirable, and the officers and employees of the Partnership may exercise the authority granted to them, and (ii) may employ on behalf of the Partnership any other Persons to perform services for the Partnership, including Affiliates of any Partner.

      4.4    <u>No Management Participation by any Limited Partner</u>. Subject to Section 4.5.2, no Limited Partner shall take part in, or at any time interfere in any manner with, the management, conduct or control of the business and operations of the Partnership, nor have any right or authority as such to act for or bind the Partnership in any manner whatsoever. No Partner shall have the power, right or authority to remove DGHC as the General Partner.

      4.5    <u>Scope of Authority of the General Partner</u>.

      4.5.1    Subject to Section 4.5.2 and 4.5.3 hereof, all decisions to be made on behalf of the Partnership shall be made by the General Partner and all actions to be taken or documents to be executed on behalf of the Partnership shall be taken and executed by the General Partner.

      4.5.2    While the general authority to manage the day-to-day business and affairs of the General Partner shall be vested in its members, the management of the General Partner shall be delegated to a board of managers of the General Partner (the "GP Board") consisting of up to five individual managers appointed by Daily Gazette Company and in no event may the GP Board consist of more than five managers without the consent of the managers appointed pursuant to Section 5(b) of the Operating Agreement of DGHC by the Warrant Holder or the Class B Limited Partner(s), as applicable; provided, however, that in no event may the GP Board

16

consist of more than five managers unless not fewer than forty percent (40%) are appointed by the Warrant Holder or the Class B Limited Partner(s), as applicable. Unless and until the Warrant Holder exercises its rights under the Warrant to purchase any Class B Limited Partner Units, Daily Gazette Company shall delegate its right to appoint two (2) of the members of the GP Board (or such greater number as required by Section 5(b)(ii) of the Operating Agreement of DGHC) to the Warrant Holder, and upon the purchase by the Warrant Holder of any Class B Limited Partner Units pursuant to the Warrant, Daily Gazette Company shall delegate its right to appoint two (2) of the members of the GP Board (or such greater number as required by Section 5(b)(ii) of the Operating Agreement of DGHC) to the Class B Limited Partner(s). If there is more than one Class B Limited Partner, then the right to appoint two (2) of the members of the GP Board (or such greater number as required by Section 5(b)(ii) of the Operating Agreement of DGHC) will be vested solely in the Class B Limited Partner that supervises editorial and reportorial functions of the <u>Mail</u> pursuant to Section 9.1 hereof. Neither the Warrant Holder nor the Class B Limited Partner(s) may appoint current employees of the Joint Venture, Daily Gazette Company, DGHC, the Partnership or Daily Gazette Publishing Company, LLC to represent it on the GP Board. The GP Board shall only have the power and authority to act by the vote of the constituent managers and no individual manager, in the capacity of manager, shall have the power or authority to bind the General Partner. Voting by the managers shall be on a per capita basis. Actions may be taken by the GP Board by, but only by, a majority vote of the managers; provided, however, that actions by the GP Board concerning (x) the budgeted Editorial Expenses (as that term is defined in the JOA) for The Charleston Gazette and the <u>Mail</u> or (y) "news hole" and color usage allocations for The Charleston Gazette and the <u>Mail</u> shall require the prior approval of at least 75% of the managers of the GP Board (i.e., if the GP Board

17

consists of four managers, not fewer than three managers must vote in favor of the particular action, and if the GP Board consists of five managers, not fewer than four managers must vote in favor of the particular action). Either Daily Gazette Company or, as applicable, the Warrant Holder or the Class B Limited Partner(s) may at any time, by written notice to the other, remove its managers, with or without cause, and substitute managers to serve in their stead. No manager shall be removed from office, with or without cause, without the consent of the Person that designated him. Each member of the GP Board appointed by the Warrant Holder or the Class B Limited Partner(s) may act (or refrain from acting), and the Warrant Holder or the Class B Limited Partner(s) may instruct such members of the GP Board, in their capacity as such, to act (or refrain from acting) solely according to the interests (or the perceived interests) of the Warrant Holder or the Class B Limited Partner(s) and none of the foregoing shall be deemed to breach any fiduciary duty that, pursuant to this Agreement or at law or in equity, the Warrant Holder or the Class B Limited Partner(s) otherwise would be deemed to have to the Partnership, the General Partner or Daily Gazette Company. The GP Board shall hold such meetings no less frequently than once per calendar quarter and at such times and places as shall be determined by the members of the GP Board. Special meetings of the GP Board may be called at any time by agreement of the members of the GP Board. The GP Board may establish such procedures for the conduct of meetings as may be agreed by the members of the GP Board.

4.5.3  Without the written consent of the Limited Partners, or except as specifically authorized in this Agreement, the General Partner may not:

(a)     Do any act in contravention of this Agreement, the JOA or the Certificate of Limited Partnership.

18

(b)     Do any act that would make it impossible to carry on the ordinary business of the Partnership.

(c)     Change the purposes of the Partnership as set forth in Section 2.4 hereof.

(d)     Dissolve the Partnership.

(e)     Make any disposition of assets contributed by CPC to the Partnership on the date of the Prior Partnership Agreement that would impair the ability of the Partnership to make the terminating distributions to CPC that are contemplated by Section 7.3 hereof (provided no consent of the Limited Partners will be required for any disposition of such assets pursuant to any foreclosure action of the Joint Venture's lenders).

4.6     <u>Liability</u>. If any provision herein shall, under applicable law, subject any Limited Partner to liability as a general partner of the Partnership, such provision shall be deemed suspended and of no force and effect until such time as the effectiveness of such provision does not subject such Limited Partner to such liability.

4.7     <u>Indemnification</u>. The Partnership shall indemnify the General Partner and its Affiliates and the employees, officers, directors, each member of the GP Board, shareholders, partners, members and agents of such Persons (each an "Indemnified Person") and shall defend and hold the Indemnified Persons harmless from any claim, demand, judgment, cost or expense (including attorneys' fees, which shall be paid as incurred) arising out of or related to any act or omission by such Indemnified Persons on behalf of the Partnership, except for any act or omission which is finally adjudicated to have constituted willful misconduct on the part of such Indemnified Person. In no event shall any Indemnified Person be liable to the Partnership or to any other Partner, except for conduct which is finally adjudicated to have constituted willful misconduct on the part of such Indemnified Person. Any Person who is within the definition of

"Indemnified Person" at the time of any act or omission shall be entitled to the benefits of this Section 4.7 as an "Indemnified Person" regardless of whether such Person continues to be within the definition of "Indemnified Person" at the time of his or its claim for indemnification or exculpation hereunder.

4.8     Partnership Expenses. The Partnership shall pay for all necessary and reasonable direct expenses of the Partnership.

4.9     Other Ventures. Subject to the terms of the JOA, neither Daily Gazette Company, nor any Partner, may engage in other ventures in the Charleston, West Virginia market that are competitive with that of the Partnership or any of its Subsidiaries. For purposes of this Section 4.9, any competitive venture undertaken by an Affiliate of a Partner in the Charleston, West Virginia market will be deemed to be a competitive venture undertaken by such Partner and a breach of this Agreement by such Partner.

ARTICLE V

Distributions and Allocations

5.1     Distributions.

5.1.1     Distributions to Class A Limited Partner. With respect to each Fiscal Year that the Class A Limited Partner produces editorial and news copy for the Mail, the General Partner shall cause the Partnership to distribute cash to the Class A Limited Partner in an amount equal to the cash received by the Partnership with respect to its interest in the Joint Venture, pursuant to and subject to the terms of paragraphs (1), (2) and (3) of Section V J of the JOA. Such cash shall be distributed by the Partnership to the Class A Limited Partner as soon as reasonably practicable following its receipt by the Partnership.

20

5.1.2    Tax Distributions.

(a)    During each Fiscal Year, the General Partner shall cause the Partnership to distribute cash to the Class B Limited Partner(s) and to the General Partner in an amount equal to the excess, if any, of (i) the product of (1) the Net Cumulative Profit allocated to such Partner and (2) the Tax Rate with respect to such Fiscal Year, over (ii) the aggregate distributions to such Partner after the date hereof pursuant to Section 5.1.4 and this Section 5.1.2 (such excess being such Partner's "Tax Shortfall"). For purposes of this Section 5.1.2(a), distributions made within 120 days of the end of any Fiscal Year may be designated by the General Partner as Tax Distributions with respect to such Fiscal Year and shall be treated for purposes of this Section 5.1.2(a) as having been made during such Fiscal Year.

(b)    If the aggregate amount to be distributed by the Partnership pursuant to Section 5.1.2(a) is less than the aggregate amount of the Tax Shortfall for all Partners, then the amount to be distributed will be distributed among the Partners pro rata in accordance with the amounts of their respective Tax Shortfalls.

5.1.3    Distributions to General Partner. With respect to a Fiscal Year, after the distributions required by Sections 5.1.1 and 5.1.2, the General Partner shall cause the Partnership to distribute cash in an amount not to exceed $650,000 to the General Partner. The distributions provided in this Section 5.1.3 shall be made only to the extent such distributions are not prohibited by the Partnership's credit agreements or other agreements to which the Partnership is a party.

5.1.4    Other Cash Distributions. During a Fiscal Year, after the distributions required by Sections 5.1.1, 5.1.2 and 5.1.3, the General Partner may cause the Partnership to

distribute additional cash at such times and in such amounts as the General Partner may determine to be appropriate in its sole discretion, in the following order and priority:

(a)     If the product of the Partner Ratio Percentage of any Class B Limited Partner and the sum of all distributions to the General Partner pursuant to Section 5.1.2 is greater than the sum of all distributions to such Class B Limited Partner pursuant to Section 5.1.2, cash shall be distributed to such Class B Limited Partner in the amount of such excess;

(b)     If the sum of all distributions to any Class B Limited Partner pursuant to Section 5.1.2 is greater than the product of Partner Ratio Percentage of such Class B Limited Partner and the sum of all distributions to the General Partner pursuant to Section 5.1.2, cash shall be distributed to the General Partner in the amount of such excess;

(c)     Thereafter, cash shall be distributed to the Class B Limited Partner(s) and the General Partner pro rata in accordance with their Capital Account balances until such Capital Account balances are zero; and

(d)     Any additional cash shall be distributed to the Class B Limited Partner(s) and the General Partner in accordance with their Percentage Interests.

5.1.5 Withholding. Any amount that has been withheld pursuant to the Code or any provision of any state or local tax law with respect to any payment or distribution to the Partnership or the Partners shall be treated as an amount which was distributed to a Partner pursuant to Section 5.1 hereof for all purposes of this Agreement.

5.2     Allocations of Net Profit and Net Loss.

5.2.1     Net Profit. Except as otherwise provided in this Agreement, Net Profit of the Partnership for each Fiscal Year shall be allocated as follows:

22

(a)     first, Net Profit shall be allocated so as to offset any Net Loss allocated to the General Partner pursuant to Section 5.2.2(c);

(b)     second, Net Profit shall be allocated to the Class B Limited Partner(s) and to the General Partner so as to offset any Net Loss allocated to them pursuant to Section 5.2.2(b), pro rata in proportion to the amount of Net Loss to be offset; and

(c)     thereafter, Net Profit shall be allocated to the Class B Limited Partner(s) and the General Partner in accordance with their Tax-Adjusted Percentage Interests.

5.2.2   Net Loss. Except as otherwise provided in this Agreement, Net Loss of the Partnership for each Fiscal Year shall be allocated as follows:

(a)     first, Net Loss shall be allocated to the Class B Limited Partner(s) and to the General Partner so as to offset any Net Profit allocated to them pursuant to Section 5.2.1(c) (to the extent not distributed pursuant to Section 5.1), pro rata in proportion to the amount of Net Profit to be offset.

(b)     second, Net Loss shall be allocated to the Class B Limited Partner(s) and the General Partner in accordance with their Percentage Interests until the Class B Limited Partner's or Partners' Adjusted Capital Account balance is zero; and

(c)     thereafter, all remaining Net Loss shall be allocated to the General Partner.

5.2.3   Allocations of Net Profit and Net Loss Following Dissolution.

(a)     Notwithstanding Sections 5.2.1 and 5.2.2, following the dissolution of the Partnership pursuant to Article VII, beginning in the Fiscal Year in which such dissolution occurs or beginning in any Fiscal Year prior to the Fiscal Year in which such dissolution occurs if the Partnership's Federal income tax return for such prior Fiscal Year has not yet been required

23

to be filed (not including extensions), items of income, gain, loss and deduction described in clause (iii) of Section 1.1.29 that are attributable to the adjustment to the Gross Asset Value of assets distributed in kind to the Class A Limited Partner pursuant to Section 7.3.2 (if any) shall be allocated to the Class A Limited Partner, and thereafter, all remaining items of income, gain, loss and deduction shall be allocated among the Partners so as to cause the credit balance in each Partner's Capital Account to equal the amount of distributions such Partner would be entitled to receive if the Partnership were to distribute an amount equal to the aggregate credit balances in all Partners' Capital Accounts (after such allocations of income and gain, loss and deduction) in accordance with the following:

(i) First, the Partnership would distribute to the Class A Limited Partner cash in an amount equal to the aggregate cash distributed to the Partnership pursuant to clause (2)(a) of Section VI B of the JOA;

(ii) Second, the Partnership would distribute to each Class B Limited Partner cash in an amount equal to the following:

(1) the product of such Class B Limited Partner's Percentage Interest and the Fair Market Value of the Partnership; *plus*

(2) the excess (only if such amount is greater than zero) of (A) the product of such Class B Limited Partner's Partner Ratio Percentage and the sum of all distributions to the General Partner pursuant to Section 5.1.2 over (B) the sum of all distributions to such Class B Limited Partner pursuant to Section 5.1.2; *less*

(3) the excess (only if such amount is greater than zero) of (A) the sum of all distributions to such Class B Limited Partner pursuant to Section 5.1.2 over

24

(B) the product of such Class B Limited Partner's Partner Ratio Percentage and the sum of all distributions to the General Partner pursuant to Section 5.1.2; *plus*

(4) an amount equal to the excess, if any, of (A) the quotient obtained by dividing Net Cumulative Profits allocated to such Class B Limited Partner by one (1) minus the Tax Rate then in effect, over (B) Net Cumulative Profits allocated to such Class B Limited Partner (such amount being the "Tax Gross-Up Amount").

(iii) Thereafter, the Partnership would distribute all remaining cash and other assets of the Partnership to the General Partner.

(b) For purposes of this Section 5.2.3, the "Fair Market Value of the Partnership" shall equal:

(i) the Value of the Partnership's Business, *plus*

(ii) any current assets of the Partnership, calculated as of the date of dissolution, as defined and determined in accordance with generally accepted accounting principles, *less*

(iii) the sum of $2,448,300 (which the parties agree shall represent the amount of the unfunded accrued benefit obligation for the Charleston Newspapers Retirement Benefit Plan as of the date of dissolution), and $506,731 (which the parties agree shall represent the amount of the unfunded accrued benefit obligation for the Charleston Newspapers Post Retirement Medical Benefit Program as of the date of dissolution), *less*

(iv) any debts and liabilities of the Partnership and reserves for unmatured, contingent or unforeseen liabilities of the Partnership (other than unfunded obligations under the Charleston Newspapers Retirement Benefit Plan and Post-Retirement

25

Medical Benefit Program), calculated as of the date of dissolution, as defined and determined in accordance with Section 7.3 and generally accepted accounting principles, *less*

(v)     the costs of an investment banking firm or appraisal firm or firms selected to determined the Fair Market Value of the Partnership, *less*

(vi)    the amount determined in Sections 5.2.3(a)(ii)(2) and 5.2.3(a)(ii)(3), if any.

The "Value of the Partnership's Business" shall be the going concern value of the Partnership as of the date of dissolution as determined by mutual agreement of the General Partner and the Class B Limited Partner(s) or by appraisals in accordance with this Section 5.2.3.

In determining the Value of the Partnership's Business, the General Partner and the Class B Limited Partner(s), or the appraisers selected to determine the Fair Market Value of the Partnership, as the case may be, (1) shall assume that the value of any business is the cash price at which the assets of such business as a going concern would change hands between a willing buyer and a willing seller (neither acting under compulsion) in an arms-length transaction, on terms and subject to conditions and costs applicable in the newspaper publishing industry, (2) shall assume that all assets used in the operation of the business of the Partnership and its Subsidiaries, whether owned by or licensed to the Partnership or any of its Subsidiaries (and all other assets of any Affiliate of the Partnership that are used by the Partnership or any of its Subsidiaries), were entirely owned directly by the Partnership, (3) shall not take into account expenditures in respect of any management agreements entered into by the Joint Venture. In the event the General Partner and the Class B Limited Partner(s) do not agree on the Fair Market Value of the Partnership within twenty days, then within fifteen days of the expiration of such twenty day period (or such longer period as the General Partner and the Class B Limited

26

Partner(s) mutually agree), each of the General Partner and the Class B Limited Partner(s) shall select a nationally recognized appraiser with experience in the newspaper industry to prepare, using the methodology described in this paragraph, a written appraisal setting forth such appraiser's determination of the Fair Market Value of the Partnership. If either the General Partner and the Class B Limited Partner(s) fail to so appoint an appraiser within such fifteen day period, then its right to do so shall lapse and the appraisal made by the one appraiser who is timely appointed shall be the Fair Market Value of the Partnership. If two appraisals are made, unless the higher of the two appraisals is more than 110% more than the lower appraisal, the Fair Market Value of the Partnership will be the average of the two appraisals, and if the higher of the two appraisals is more than 110% more than the lower of the appraisals, the General Partner and the Class B Limited Partner(s) shall jointly select a third appraiser, and the Fair Market Value will be the average of the two of the three appraisals that are closest together in amount. All appraisals will be made within twenty days of appointment of such appraiser and must separately identify the amount of each of the items described in clauses (i) through (vi) of Section 5.2.3(b). A written notice of the results of each such appraisal shall be given to the General Partner and the Class B Limited Partner(s). The General Partner and the Class B Limited Partner(s) will each pay the fees of the appraiser selected by it, and the General Partner and the Class B Limited Partner(s) will share equally the fees of the third appraiser, if any. The General Partner and each Member will cooperate fully with each appraiser's attempt to determine the Fair Market Value of the Partnership.

27

5.3     Special Allocations.

      5.3.1     Limited Partners.

      (a)     The Partnership shall specially allocate to the Class A Limited Partner (in its capacity as such) items of Partnership income for each Fiscal Year in an amount equal to the cash distributed to the Class A Limited Partner (in its capacity as such) pursuant to Section 5.1.1. Notwithstanding any other provisions of this Agreement, except Section 5.2.3 and this Section 5.3.1, no other items of income, gain, loss or deduction shall be allocated to the Class A Limited Partner (in its capacity as such).

      (b)     The Partnership shall specially allocate to the General Partner items of Partnership income and gain in the amount of $650,000 for each Fiscal Year.

      5.3.2     Minimum Gain Chargeback. Notwithstanding any other provision of this Article V to the contrary, if there is a net decrease in Partnership Minimum Gain for any Fiscal Year, each of the General Partner and each Class B Limited Partner shall be specially allocated items of Partnership income and gain for such Fiscal Year (and if necessary, for succeeding Fiscal Years) in an amount equal to such Partner's share of the net decrease in Partnership Minimum Gain as determined in accordance with Treasury Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Partner pursuant thereto. However, this Section 5.3.2 shall not apply to the extent that the circumstances which are described in Treasury Regulations Sections 1.704-2(f)(2), 1.704-2(f)(3), 1.704-2(f)(4) or 1.704-2(0(5) exist. The items of Partnership income and gain that are to be allocated pursuant to this Section 5.3.2 shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2).

28

This Section 5.3.2 is intended to comply with the minimum gain chargeback requirement of Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

5.3.3 <u>Partner Minimum Gain Chargeback</u>. Notwithstanding any other provision of this Article V, except Section 5.3.2, to the contrary, if, during any Fiscal Year, there is a net decrease in Partner Nonrecourse Debt Minimum Gain attributable to a Partner Nonrecourse Debt, each of the General Partner and each Class B Limited Partner with a share of that Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt (as determined in accordance with Treasury Regulations Section 1.704-2(i)(5)) as of the beginning of such Fiscal Year shall be specially allocated items of Partnership income and gain for the Fiscal Year (and, if necessary, for succeeding Fiscal Years) in an amount equal to such Partner's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt in accordance with Treasury Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Partner pursuant thereto. The items of Company income and gain to be allocated pursuant to this Section 5.3.3 shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This Section 5.3.3 is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

5.3.4 <u>Qualified Income Offset</u>. In the event that any Partner unexpectedly receives any of the adjustments, allocations or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) or 1.704-1(b) (2)(ii)(d)(6), items of Partnership income and gain shall be specially allocated to such Partner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, any deficit

balance of such Partner's Adjusted Capital Account as quickly as possible. However, an allocation shall be made pursuant to this Section 5.3.4 if, and only to the extent that, such Partner would have a deficit balance in its Adjusted Capital Account after all of the other allocations that are provided for in this Article V have been tentatively made as if this Section 5.3.4 were not a part of this Agreement.

5.3.5 <u>Gross Income Allocation</u>. In the event that any Partner has a deficit Capital Account at the end of any Fiscal Year that is in excess of the sum of (i) the amount such Partner is obligated to restore to the Partnership pursuant to this Agreement or as otherwise described in Treasury Regulations Section 1.704-1(b)(2)(ii)(c), (ii) the amount such Partner is deemed to be obligated to restore pursuant to the penultimate sentence of Treasury Regulations Section 1.704-2(g)(1) and (iii) the amount such Partner is deemed to be obligated to restore pursuant to the penultimate sentence of Treasury Regulations Section 1.704-2(i)(5), such Partner shall be specially allocated items of Partnership income and gain in the amount of such excess as quickly as possible. However, an allocation shall be made pursuant to this Section 5.3.5 if, and only to the extent that such Partner would have a deficit Capital Account in excess of such sum after all of the other allocations that are provided for in this Article V have been tentatively made as if Section 5.3.4 and this Section 5.3.5 were not a part of this Agreement.

5.3.6 <u>Nonrecourse Deductions</u>. Nonrecourse Deductions for any Fiscal Year or other period shall be specially allocated to the General Partner.

5.3.7 <u>Partner Nonrecourse Deductions</u>. Any Partner Nonrecourse Deductions for any Fiscal Year or other period shall be specially allocated to the Partner who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner

Nonrecourse Deductions are attributable in accordance with Treasury Regulation Section 1.704-2(i).

      5.3.8   <u>Section 754 Adjustment</u>.

      (a)   To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Code Section 734(b) or 743(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(*m*)(*4*) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Partner's Partnership Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of such asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Net Profit and Net Loss.

      (b)   To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(*m*)(*2*) or 1.704-1(b)(2)(iv)(*m*)(*4*), to be taken into account in determining Capital Accounts as the result of a distribution to a Partner in complete liquidation of its interest, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) from the disposition of the asset and shall be specially allocated to the Partners as Net Profit or Net Loss in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(*m*)(*2*) applies, or to the Partner to whom such distribution is made in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(*m*)(*4*) applies.

     5.4   <u>Curative Allocations</u>. The allocations set forth in Sections 5.3.2, 5.3.3, 5.3.4, 5.3.5, 5.3.6, 5.3.7 and 5.3.8 hereof (the "Regulatory Allocations") are intended to comply with

certain requirements of the Treasury Regulations. It is the intent of the Partners that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of income, gain, loss, or deduction pursuant to this Section 5.4. Therefore, notwithstanding any other provision of this Article V (other than the Regulatory Allocations), the General Partner shall make such offsetting special allocations of income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Partner's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Partner would have had if the Regulatory Allocations were not in this Agreement. In exercising its discretion under this Section 5.4, the General Partner shall take into account future Regulatory Allocations under Sections 5.3.2 and 5.3.3 that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 5.3.6 and 5.3.7.

5.5     Tax Allocations; Code Section 704(c).

5.5.1     Except as otherwise provided in this Section 5.5, each item of income, gain, loss and deduction of the Partnership recognized for income tax purposes shall be allocated to the Partners in accordance with the allocation of the corresponding "book" items pursuant to Sections 5.2, 5.3 and 5.4.

5.5.2     In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation between the adjusted basis of such property to the Partnership for Federal income tax purposes and its initial Gross Asset Value in accordance with Code Section

704(c) and the Treasury Regulations thereunder, provided, however, that no such Section 704(c) allocations shall be made to the Class A Limited Partner (in its capacity as such).

5.5.3 In the event that the Gross Asset Value of any Partnership asset is adjusted pursuant to clause (ii) of the definition of Gross Asset Value, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for Federal income tax purposes and its Gross Asset Value in accordance with Code Section 704(c) and the Treasury Regulations thereunder, provided, however, that no such Section 704(c) allocations shall be made to the Class A Limited Partner (in its capacity as such).

5.5.4 Any elections or other decisions relating to such allocations shall be made by the Tax Matters Partner in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations that are made pursuant to this Section 5.5 are made solely for purposes of Federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Partner's Capital Account or share of Net Profit, Net Loss or other items or distributions pursuant to any provision of this Agreement.

5.6     Allocation in Event of Transfer. If a Partnership Interest is Transferred in accordance with Article VI of this Agreement, the Net Profit and Net Loss of the Partnership shall be calculated as of the end of the month immediately prior to the month in which the transfer is effective. The transferor Partner shall be allocated an amount which is equal to the Net Profit and Net Loss of the Partnership that is allocable to the period ending on the last day of the month immediately prior to the Transfer. The Transferee shall be allocated an amount which is equal to the Net Profit and Net Loss of the Partnership that is allocable to the remainder of the calendar year. As of the effective date of such Transfer, the Transferee shall succeed to the

Capital Account of the transferor Partner with respect to the Transferred Partnership Interest. This Section 5.6 shall apply for purposes of computing a Partner's Capital Account and for Federal income tax purposes.

## ARTICLE VI

### Transfer of Partnership Interests

6.1     Limitations on Transfers.

6.1.1     Except as provided in Section 6.1.2, no sale, assignment, transfer, pledge, hypothecation or other disposition (any or all of the foregoing, a "Transfer") of a Partnership Interest will be effective nor will any purported Transferee become a Partner or otherwise be entitled to any of the attributes of ownership of the Partnership purportedly Transferred.

6.1.2     The restrictions of Section 6.1.1 shall not apply to:

(a)     a Transfer pursuant to Article VII;

(b)     in the case of the Class A Limited Partner, a Transfer of its entire Class A Limited Partnership Interest approved by the General Partner, which approval shall not be unreasonably withheld (the Class A Limited Partner acknowledges and agrees that the General Partner's ability to grant consent to a Transfer is circumscribed by certain contractual restrictions under the Joint Venture's financing arrangements and the withholding of consent by the General Partner in order to comply with these contractual restrictions will not be considered unreasonable);

(c)     in the case of a Class B Limited Partner, a Transfer permitted by and made in accordance with the provisions of the Put/Call Agreement to which such Class B Limited Partner is a party;

34

(d)    in the case of the General Partner or any permitted Transferee of the General Partner, any Transfer to an Affiliate of the General Partner and any other Transfer so long as at the time of such Transfer the Joint Venture is current in the distributions and payments required to be made to the Class A Limited Partner pursuant to Section V J(l) through (4) of the JOA, and provided that if the Joint Venture is not so current, the General Partner shall obtain the consent of the Class A Limited Partner prior to any Transfer pursuant to this Section 6.1.2(d);

(e)    a Transfer pursuant to a foreclosure action by the Joint Venture's lenders; or

(f)    any Transfer of all or any portion of the ownership interests in the Class A Limited Partnership Interest or the Partnership Interest with respect to any of the Class B Limited Partner Units to MNG or an Affiliate of MNG so long as (1) all of the other requirements of this Article VI have been complied with and (2) MNG or an Affiliate of MNG holds and maintains, directly or indirectly, voting control of such Transferee following such Transfer.

6.2    Transferees.

6.2.1    Notwithstanding any provision to the contrary contained herein, no Partnership Interest may be transferred unless such Transfer is made in accordance with the provisions of this Article VI and the transferor and the Transferee have complied with the following conditions:

(a)    the transferor has executed and delivered to the General Partner a copy of the assignment of the Partnership Interest to Transferee in form and substance reasonably satisfactory to the General Partner; and

35

(b)    the Transferee, if not already a party to this Agreement, becomes a party to this Agreement, assumes all of the obligations hereunder of its transferor in respect of such Partnership Interest and agrees to be bound by the terms and conditions hereof in the same manner as the transferor.

6.2.2    Upon compliance with Section 6.1 and 6.2.1, any Transferee shall be substituted as a Partner for, and shall enjoy the same rights and be subject to the same obligations as, its predecessor as a Partner hereunder, and the General Partner shall prepare and file as soon as practicable, if required by law, an amendment to the Certificate of Limited Partnership and any other qualification documents. Exhibit A hereto shall also be amended to reflect such Transfer.

6.2.3    If there is a permitted Transfer of a Partnership Interest under this Agreement:

(a)    In the case of a Transfer by any Partner, such Partner shall, upon the effectiveness of such Transfer, be released and discharged from any further liability under this Agreement in respect of such Partnership Interest, provided, however, that such transferring Partner shall remain liable to the Partnership for any Partnership distributions wrongfully paid to or received by such transferring Partner or that are required by law to be returned to the Partnership; and

(b)    If requested to do so by any transferring Partner or by the Transferee by notice given to the Partners, the Partnership shall make an election under Section 754 of the Code (and a corresponding election under applicable state and local law). Upon the request of any Partner, the Partnership shall also make a timely election under Section 754 of the Code upon a distribution of property or money to a Partner.

36

6.3     Transfers of Interests in Partners.

6.3.1    The transfer of a majority of the issued and outstanding capital stock (or equivalent interest) of a Partner or a controlling interest of a Partner, however accomplished, whether in a single transaction or in a series of related or unrelated transactions, and whether directly or by transfer of stock (or equivalent interest) of a direct or indirect parent corporation or other entity or otherwise, shall be deemed to be a purported Transfer of an interest in the Partnership for purposes of this Agreement.

6.3.2    Except as provided in Section 6.3.3, MNG agrees that it will not Transfer (whether voluntarily, involuntarily or by operation of law) all or any part of its ownership interests in the Class A Limited Partner, without the consent of the General Partner, which consent shall not be unreasonably withheld (MNG acknowledges and agrees that the General Partner's ability to grant consent to a Transfer is circumscribed by certain contractual restrictions under the Joint Venture's financing arrangements and the withholding of consent by the General Partner in order to comply with these contractual restrictions will not be considered unreasonable).

6.3.3    The restriction of Section 6.3.1 shall not apply and no consent of the General Partner shall be required for (x) a Transfer directly or indirectly by MNG or CPC of its ownership interests in the Class A Limited Partner or any Class B Limited Partner to an Affiliate of MNG so long as (1) all of the other requirements of this Article VI have been complied with and (2) MNG or a MNG Affiliate holds and maintains, directly or indirectly, voting control of such Transferee following such Transfer, and (y) the grant of a security interest in the ownership interests in the Class A Limited Partner or any Class B Limited Partner.

6.4    Other Consents and Requirements. Any Transfer must be in compliance with all requirements imposed by any state securities administrator having jurisdiction over the Transfer and the United States Securities and Exchange Commission.

6.5    Assignment Not In Compliance. Any Transfer in contravention of any of the provisions of this Article VI (whether voluntarily, involuntarily or by operation of law) shall be void and of no effect, and shall neither bind nor be recognized by the Partnership.

6.6    Pledge. Each Partner and any permitted Transferee of each Partner may collaterally assign its Partnership Interest and its attendant rights under this Agreement to the Joint Venture's lenders for security purposes. Each Limited Partner may at any time assign its Partnership Interest and its rights under this Agreement as collateral security to Persons extending financing to such Limited Partner or any of its Affiliates (and such Persons may at any time foreclose on such security interest).

6.7    Division of Partnership Interests. The several rights and obligations inherent in the Capital Account and Partnership Interest are indivisible except in equal proportions, such that the assignment of a specified percentage of a Partner's Partnership Interest may only represent an equal percentage of the total Capital Account that was attributable to such Partner's Partnership Interest prior to the assignment.

6.8    Withdrawal of Partners. No Partner may withdraw from the Partnership except upon the transfer of its Partnership Interest permitted under the provisions of this Agreement or upon the dissolution and winding up of the Partnership in accordance with the provisions of Article VII. For purposes of this Agreement, the term "withdrawal" does not include the happening of any event described in Section 17-402(a)(4) or (5) of the Act, and no Partner shall cease to be a Partner solely upon the happening of such event(s). The withdrawal of a Partner

38

shall not alter the allocations and distributions to be made to the Partners pursuant to this Agreement.

6.9 <u>Issuance of Partnership Interests</u>. Subject to the provisions of any Put/Call Agreement, the General Partner may cause the Partnership to issue additional Partnership Interests to any Person and may admit to the Partnership as additional Partners the Person acquiring such Partnership Interests, if such Persons were not previously admitted as Partners. The Persons acquiring such Partnership Interests shall have the rights and be subject to the obligations set forth in this Agreement as it may be amended in accordance with Section 9.8 in connection therewith. A Person admitted as a new Partner shall only be entitled to distributions and allocations of Net Profit and Net Loss attributable to the period beginning on the effective date of its admission to the Partnership, and the Partnership shall attribute Net Profit and Net Loss to the period before the effective date of the admission of a new Partner and to the period beginning on the effective date of the admission of a new Partner by the closing of the books method. The Partnership will not issue any additional Class A Limited Partner Units to any other Person without the consent of the Class A Limited Partner and will not issue Class B Limited Partner Units to any other Person without the consent of the holders of the majority of the Class B Limited Partner Units.

## ARTICLE VII

## Dissolution and Liquidation

7.1 <u>Events of Dissolution</u>. The Partnership shall be dissolved, terminated and liquidated upon the happening of any of the following events:

(a) the expiration of the term of the Partnership as set forth in Section 2.7;

39

(b)     at such time as the JOA shall expire or otherwise terminate;

(c)     upon mutual agreement of the Partners; or subject to any provision of this Agreement that limits or prevents dissolution, the happening of any event that, under applicable law, causes the dissolution of a limited partnership.

7.2     Liquidation. Upon dissolution of the Partnership for any reason, the Partnership shall immediately commence to wind up its affairs in accordance with this Article VII. A reasonable period of time shall be allowed for the orderly termination of the Partnership's business, discharge of its liabilities, and distribution or liquidation of the remaining assets so as to enable the Partnership to minimize the normal losses attendant to the liquidation process. The dissolution and liquidation of the Partnership shall be conducted and supervised by the General Partner, who is hereby authorized and empowered to execute on behalf of the Partnership any and all documents necessary or desirable to effectuate the dissolution and liquidation of the Partnership and the transfer of any property of the Partnership.

7.3     Priority on Liquidation. The General Partner shall, to the extent feasible, liquidate and/or distribute the assets of the Partnership as promptly as shall be practicable consistent with the other provisions hereof. Such assets, or the proceeds of such liquidation, shall be applied as follows:

7.3.1    first, to the payment of the debts and liabilities of the Partnership, in the order of priority provided by law (excluding any loans by any Partner to the Partnership);

7.3.2    second, the Partnership shall distribute to the Class A Limited Partner the Mail masthead, all trademarks, copyrights, trade names, service names and service marks of the Mail, subscriber and advertiser lists, print and electronic archives of the Mail, associated websites and URLs (including "dailymail.com") and all legal rights associated with these assets,

40

subject to such dispositions, additions or substitutions relating thereto which may have occurred in the ordinary course of the operations of the Partnership or the Joint Venture subsequent to the date hereof, including in particular, any and all lists of advertisers and subscribers to Mail, together with copies of any contracts with such subscribers relating to Mail and any executory contracts for the purchase of advertising in Mail, free and clear of any lien, encumbrance, right or interest (including any option or any license or other right of use) of or in favor of a third party, transfer restriction (including any right of first offer or refusal or similar provision) or any other similar right or interest whatsoever;

7.3.3    third, to the payment of loans by any Partner to the Partnership and the payment of the expenses of liquidation;

7.3.4    fourth, to the setting up of any reserve which the General Partner may deem reasonably necessary for contingent or unforeseen liabilities or obligations of the Partnership or any liability or obligation not then due and payable; provided, however, that any such reserve shall be paid over by the General Partner into a Partnership account established for such purpose, to be held in such account for the purpose of disbursing such reserves in payment of such liabilities, and, at the expiration of such holdback period as the General Partner shall deem advisable, to distribute the balance thereafter remaining in the manner herein provided; and

7.3.5    fifth, to payment to the Partners, in accordance with the following order of priority:

(a)    First, the Partnership shall distribute to the Class A Limited Partner, subject to the prior satisfaction of the claims of all creditors, cash in an amount equal to the aggregate cash distributed to the Partnership from the Joint Venture pursuant to clause (2)(a) of Section VI B of the JOA.

41

(b) Thereafter, the Partnership shall distribute all remaining assets to the Class B Limited Partner(s) and the General Partner in accordance with their respective Capital Account balances.

7.4 <u>Statements on Liquidation</u>. Each of the Partners shall be furnished with a statement which shall set forth the assets and liabilities of the Partnership as at the date of dissolution and as at the date of complete liquidation, the share of each Partner thereof, and a reasonably detailed report of the manner of disposition of the assets of the Partnership. Upon compliance with the foregoing distribution plan and completion of the winding up process, the Partnership shall be terminated and the General Partner shall cause the cancellation of the Certificate of Limited Partnership and all qualifications of the Partnership as a foreign limited partnership in jurisdictions other than the State of Delaware and shall take such other action as may be necessary to terminate the Partnership.

7.5 <u>Return of Capital or Partition</u>. No Partner shall have any right to receive its Capital Contribution or any profit of the Partnership or to obtain a partition of assets of the Partnership or to cause the dissolution of the Partnership other than as provided in this Agreement. The General Partner shall not be personally liable for the return of the Capital Contributions of the Limited Partners, or of any portion thereof, it being expressly understood that any such return shall be made solely from Partnership assets.

ARTICLE VIII

Records and Accounting

8.1 <u>Books and Records</u>. At all times during the continuance of the Partnership, the General Partner shall keep or cause to be kept books of account of the transactions of the Partnership consistent with the provisions of the JOA. The books of account, records and all

42

documents and other writings of the Partnership shall be kept and maintained at the principal office of the Partnership or of the General Partner. Each Partner and its representatives shall, upon reasonable notice to the General Partner, have access to such books, records and documents during reasonable business hours and may inspect and make copies of any of them at its own expense.

8.2     Bank Accounts. The General Partner may from time to time open and maintain on behalf of the Partnership a bank account or accounts with such depositaries as the General Partner shall determine, in which monies received by or on behalf of the Partnership shall be deposited. All withdrawals from such accounts shall be made upon the signature of such Person or Persons as the General Partner may from time to time designate.

8.3     Required Filings. The General Partner shall cause the Partnership to file, on or before the dates the same may be due, giving effect to extensions obtained, all reports, returns and applications which may be required by any taxing authority or other governmental body having jurisdiction. The General Partner shall timely deliver to each of the Partners such information, including Schedules K-1, as may be necessary for the preparation by such Partner of its Federal, state or other tax returns.

ARTICLE IX

Miscellaneous

9.1     Supervision of Editorial Staff. In order to fulfill its obligations under the JOA, CPC shall exercise exclusive supervision over all editorial and reportorial functions of the Mail. CPC shall select the staff, designate all editors and newsroom managers, make all newsroom assignments, and set all editorial policies for the Mail. DGHC, as General Partner of the Partnership, shall cause the Joint Venture to employ the employees selected by CPC and to

43

assign those employees to work exclusively as the staff of the <u>Mail</u>. CPC shall have complete control and authority over the editors and other staff of the editorial department of the <u>Mail</u> (including the exclusive authority to determine the number, identity and salaries of the editorial department of the <u>Mail</u> and to make hiring and firing decisions, so long as the Editorial Expense for the <u>Mail</u> does not exceed the approved budgeted amount for the <u>Mail</u>). The term "editorial department" as used herein shall include the news, editorial, editorial promotion and photographic functions of the <u>Mail</u>.

9.2     <u>Notices</u>. All notices, demands and other communications which may or are to be given hereunder or with respect hereto shall be in writing, shall be given either by personal delivery, facsimile or by certified or special express mail or recognized overnight delivery service, first class postage prepaid, or when delivered to such delivery service, charges prepaid, return receipt requested, and shall be deemed to have been given or made when personally received by the addressee, addressed as follows:

(1)     If to the Class A Limited Partner, to:

MediaNews Group, Inc.
101 W. Colfax Ave., Suite 1100
Denver, CO 80202
Attn: Joseph J. Lodovic, IV President
Facsimile: (303) 954-6320

With a copy to:

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Attn: James Modlin
Facsimile: (212) 422-4726

or such other addresses as the Class A Limited Partner may from time to time designate.

(2)     If to the General Partner or the Partnership, to:

Daily Gazette Company
1001 Virginia Street, East Charleston, WV 25301
Attn: Ms. Elizabeth E. Chilton, President
Facsimile: (304) 348-5180
And
Attn. Mr. Norman Watts Shumate III
Facsimile: (304) 348-1795

With a copy to:

Edmondson + Blumenthal PLLC
12 Cadillac Drive, Suite 210
Brentwood, TN 37027
Attn: Steven E. Blumenthal
Facsimile: (615) 296-4600

or such other addresses as the General Partner or the Partnership may from time to time designate.

9.3     Further Assurances. The Partners will execute and deliver such further instruments and do such further acts and things as may be required to carry out the intent and purposes of this Agreement.

9.4     Agreement in Counterparts. This Agreement may be executed in counterparts and all counterparts so executed shall constitute one agreement binding on all the parties hereto notwithstanding that all the parties hereto are not signatories to the original or to the same counterpart.

9.5     Captions. Captions contained in this Agreement are inserted as a matter of convenience and in no way define the scope of this Agreement or the intent of any provision hereof.

60827387_2.DOCX

9.6     Construction. None of the provisions of this Agreement shall be for the benefit of or be enforceable by any creditor of the Partnership or of any Partner (subject to the security interest and other rights in favor of the Joint Venture's lenders).

9.7     Successors. Except as otherwise expressly provided in this Agreement, all provisions of this Agreement shall be binding upon, inure to the benefit of, and be enforceable by or against the successors and permitted assigns of the parties hereto.

9.8     Amendments.

9.8.1    This Agreement may be modified or amended only upon the written agreement of each of the Partners (and subject to any applicable contractual restrictions under the Joint Venture's financing arrangements), except that this Agreement may be amended from time to time by the General Partner without the consent of the Limited Partners:

(a)     to reflect the rights and obligations of a Person admitted as a Partner upon the issuance of Partnership Interests pursuant to Section 6.9 and any change in the rights and obligations of any existing Partner upon the issuance to any Person of partnership interests pursuant to Section 6.9, provided that the consent of an affected Limited Partner and/or the Warrant Holder shall be required to the extent such amendment adversely affects the interests of such Limited Partner and/or the Warrant Holder, as the case may be;

(b)     to change the Partnership's principal office or other place of business;

(c)     to change the Partnership's method of allocating income and loss for tax purposes to the extent required by new or changes to Treasury Regulations, Internal Revenue Service announcements or rulings, or final courts decisions, provided that the consent of an affected Limited Partner and/or the Warrant Holder shall be required to the extent such

amendment adversely affects the interests of such Limited Partner and/or the Warrant Holder, as the case may be;

(d)     to add to the representations, duties or obligations of the General Partner (other than duties or obligations relating to the editorial and reportorial functions of the Mail); and

(e)     to cause to be deleted from this Agreement any provision or part of any provision that is found by a court of competent jurisdiction to be invalid or unenforceable in any respect, which provision may be deleted from this Agreement by the General Partner to the extent of such invalidity or unenforceability without in any way affecting the remaining parts of such provision or the remaining provisions of this Agreement.

No change in the number of General Partner Units or Class B Limited Partner Units (whether by an amendment or otherwise) will be effective unless it has been executed or approved in writing by the holders of a majority of the Class B Limited Partner Units (or, prior to the exercise in full of the Warrant (or the termination of the Warrant), the Warrant Holder).

9.8.2     The General Partner will give notice to the Limited Partners (and, prior to the exercise in full (or termination) of the Warrant, the Warrant Holder) ten days prior to any modification or amendment to this Agreement pursuant to this Section 9.8.

9.8.3     The General Partner will cause the Partnership to prepare and file any amendment to the Certificate of Limited Partnership that may be required to be filed under the Act as a consequence of any amendment to this Agreement.

9.9     Governing Law. This Agreement and the rights and obligations of the Partners shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its conflicts of laws principles.

47

9.10    <u>Integration</u>. This Agreement amends and restates the Prior Partnership Agreement in its entirety. This Agreement, together with the JOA and the Warrant, constitute the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements (oral or written) and understandings pertaining thereto. In the event of any conflict between this Agreement and the JOA, this Agreement shall control.

9.11    <u>Severability</u>. The invalidity of any article, section, subsection, clause or provision of this Agreement shall not affect the validity of the remaining articles, sections, subsections, clauses or provisions hereof.

9.12    <u>Representations by Partners</u>. Each Partner represents and warrants to the other Partners and the Partnership that this Agreement is and will remain its valid and binding agreement, enforceable in accordance with its terms. Each Partner represents and warrants to the Partnership and the other Partners that: (i) it is fully aware that its Partnership Interest is not being registered under the Securities Act of 1933, as amended, and has been issued and sold in reliance upon federal and state exemptions for transactions not involving a public offering, that its Partnership Interest cannot and will not be sold or transferred except in a transaction that is exempt from registration under federal and state securities laws, and that such Partner is an "accredited investor" within the meaning of Regulation D under the Securities Act of 1933, as amended.

9.13    <u>Non-Disclosure</u>. Each Partner agrees that, except as otherwise consented to by the General Partner, all non-public information furnished to it or to which it has access pursuant to this Agreement will be kept confidential and will not be disclosed by such Partner or by any of its agents, representatives or employees, in any manner whatsoever, in whole or in part, except that:

(a)     each Partner shall be permitted to disclose such information to those of its (and its Affiliates') Affiliates, agents, representatives and employees who need to be familiar with such information in connection with such Partner's investment in the Partnership and who agree to maintain the confidentiality thereof in accordance with the provisions of this Section 9.13;

(b)     each Partner shall be permitted to disclose such information to its Affiliates;

(c)     each Partner shall be permitted to disclose information to the extent required by law, including federal or state securities laws or regulations, by the rules and regulations of any stock exchange or association on which securities of such Partner or any of its Affiliates are traded or by subpoena or other legal process so long as such Partner shall have first given the Partnership notice in advance of such disclosure (so that the Partnership may attempt to contest the necessity of disclosing such information) to the extent practicable under the circumstances;

(d)     each Partner shall be permitted to disclose information to the extent necessary for the enforcement of any right of such Partner arising under this Agreement;

(e)     each Partner shall be permitted to disclose information to a permitted Transferee or a prospective Permitted Transferee, so long as such Person agrees (in a writing which provides the Partnership with an independent right of enforcement) to be bound by the provisions of this Section;

(f)     each Partner shall be permitted to disclose information that is or becomes generally available to the public other than as a result of a disclosure by such Partner, its agents, representatives, or employees; and

49

(g)     each Partner shall be permitted to disclose information that becomes available to such Partner on a nonconfidential basis from a source (other than the Partnership, any other Partner, or their respective agents, representatives, and employees) that, to the best of such Partner's knowledge, is not prohibited from disclosing such information to such Partner by a legal, contractual, or fiduciary obligation to the Partnership or any other Partner or hat is derived by such Partner or its agents without reliance on information the disclosure of which is prohibited by this Section 9.13.

9.14    Execution of Papers. The Partners agree that they will not unreasonably refuse to execute such instruments, documents and papers as the General Partner deems necessary or appropriate to carry out the intent of this Agreement.

*[Signatures appear on the following page.]*

IN WITNESS WHEREOF, the parties hereto have each caused this Agreement to be duly executed by their respective officers duly authorized.

DAILY GAZETTE HOLDING COMPANY, LLC

By: Daily Gazette Company, Sole Member

By:_____

Title:_____


CHARLESTON PUBLISHING COMPANY

By:_____

Title:_____


MEDIANEWS GROUP, INC. now known as AFFILIATED MEDIA, INC. (for purposes of Section 6.3)

By:_____

Title:_____

DAILY GAZETTE COMPANY (for purposes of Section 4.9)

By:_____

Title:_____

# EXHIBIT A

## TRANSFERS TO PARTNERSHIP BY PARTNERS

| Partner | Contribution | Units Received |
|---|---|---|
| Daily Gazette Holding Company, LLC | (i) 100% of the ownership interests in Daily Gazette Publishing Company, LLC | 9,358 General Partner Units |
| | (ii) cash and other assets provided in Master Restructuring Agreement | |
| Charleston Publishing Company | Intangible and other assets more fully described in Master Restructuring Agreement | 1 Class A Limited Partnership Unit |

# EXHIBIT B

## CAPITAL ACCOUNT BALANCES AS OF DATE HEREOF

| Partner | Value |
|---|---|
| Daily Gazette Holding Company, LLC | $63,750,000 |
| Charleston Publishing Company | $1 |

AMENDED AND RESTATED OPERATING AGREEMENT
OF
DAILY GAZETTE HOLDING COMPANY, LLC

THIS AMENDED AND RESTATED OPERATING AGREEMENT OF DAILY GAZETTE HOLDING COMPANY, LLC, is entered into effective as of _____, 2009, by and between Daily Gazette Holding Company, LLC, a limited liability company organized pursuant to the Delaware Limited Liability Company Act (the "Company"), and Daily Gazette Company, a West Virginia corporation, its sole member.

RECITAL

The parties desire to amend and restate the Operating Agreement of the Company, dated as of May 7, 2004, as set forth herein.

AGREEMENT

In consideration of the mutual covenants and agreements set forth in this Agreement, the parties agree as follows.

1.     DEFINITIONS

The following terms, as used in this Agreement, have the meanings set forth in this Section:

"Act" means the Delaware Limited Liability Company Act.

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with such Person. For purposes of this definition, the term "controls" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. The terms "controlled by" and "under common control with" have meanings corresponding to the meaning of "controls."

"Agreement" means this Amended and Restated Operating Agreement, as it may be amended, restated, modified, or supplemented from time to time in accordance with its terms.

"Board of Managers" shall have the meaning set forth in Section 5 hereof.

"Certificate" is the Certificate of Formation of Daily Gazette Holding Company, LLC as filed with the Secretary of State of the State of Delaware, as the same may be amended from time to time.

"Class B Limited Partner" shall have the meaning set forth in Section 1.1.11 of the Partnership Agreement.

"Class B Limited Partner Unit" shall have the meaning set forth in Section 1.1.12 of the Partnership Agreement.

"Class B Managers" means the Managers appointed by either the Warrant Holder or the Class B Limited Partner(s) pursuant to Section 5(b)(ii) hereof.

"JOA" means that certain Second Amended and Restated Joint Venture Agreement dated as of even date herewith, as such agreement may be amended from time to time.

"Joint Venture" means Charleston Newspapers, an unincorporated West Virginia joint venture.

"Manager" means a member of the Board of Managers.

"Member" means Daily Gazette Company and its successors-in-interest under this Agreement.

"Person" means an individual, corporation, limited liability company, association, general partnership, limited partnership, limited liability partnership, joint venture, trust, estate, or other entity or organization.

"Partnership" means Charleston Newspapers Holdings, L.P., a Delaware limited partnership.

"Partnership Agreement" means that certain Amended and Restated Limited Partnership Agreement for Charleston Newspapers Holdings, L.P., dated as of even date herewith, as such agreement may be amended from time to time

"Put/Call Agreement" means a put/call agreement entered into by a Class B Limited Partner, the Company and the Partnership in connection with the exercise by the Warrant Holder of its right to purchase Class B Limited Partner Units pursuant to the terms of the Warrant, in substantially the form attached to the Warrant as Exhibit B thereto.

"Warrant" means that certain warrant, dated as of even date herewith, granted to the Warrant Holder by the Partnership to purchase Class B Limited Partner Units.

"Warrant Holder" means Charleston Publishing Company or any permitted transferee of the Warrant.

2.     THE COMPANY AND ITS BUSINESS

(a)     Formation. The Company was formed on April 12, 2004, pursuant to the provisions of the Act. Except as provided in this Agreement, all rights, liabilities, and obligations among the Member, the Company, and other Persons, shall be as provided in the Act, and this Agreement shall be construed in accordance with the provisions of the Act. To the extent that the rights or obligations of the Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

(b)     Filing of Certificate of Limited Liability Company. The Member has caused the Certificate to be filed with the Secretary of State of Delaware and shall cause the Certificate to be filed or recorded in any other public office where filing or recording is required or advisable. The Member shall do, and continue to do, all other things that are required or advisable to maintain the Company as a limited liability company existing pursuant to the laws of the State of Delaware.

(c)     Company Name. The name of the Company shall be "Daily Gazette Holding Company, LLC." The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Member deems appropriate or advisable. The Member shall file any assumed name certificates and similar filings, and any amendments thereto, that the Member considers appropriate or advisable.

(d)     Term of the Company. The term of the Company commenced on the date of the filing of the Certificate with the Secretary of State of the State of Delaware and shall continue until the Company is dissolved and its affairs wound up in accordance with the Act and Article 8 of this Agreement.

(e)     Purpose of the Company. The purpose of the Company is to do all lawful acts and things necessary, appropriate, proper, advisable, incidental to, or convenient for the furtherance and accomplishment of the foregoing purpose.

(f)     Authority of the Company. The Company shall be empowered and authorized to do all lawful acts and things necessary, appropriate, proper, advisable, incidental to, or convenient for the furtherance and accomplishment of its purposes.

(g)     Principal Office and Other Offices; Registered Agent. The address of the Company's registered office which is required to be maintained by the Company in the State of Delaware pursuant to Section 18-104 of the Act shall be located at Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, and the name of the Company's registered agent at such address is Corporation Service Company. The principal office of the Company shall be c/o Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808. The Company may maintain any other offices at any other places that the Board of Managers deems advisable. The Company may, upon compliance with the applicable provisions of the Act, change its principal office or registered agent from time to time at the discretion of the Board of Managers.

(h)     Foreign Qualification. The Company shall take all necessary actions to be authorized to conduct business legally in all appropriate jurisdictions, including registration or qualification of the Company as a foreign limited liability company in those jurisdictions that provide for registration or qualification.

(i)     Fiscal Year. The fiscal year of the Company shall be the calendar year. The Company shall have the same fiscal year for income tax purposes and for financial accounting purposes.

3. COMPANY CAPITAL

(a) Capital Contributions. The Member shall make such capital contributions to the Company as it deems appropriate.

(b) Disbursements. Subject to Section 5 hereof, the Company shall pay all costs and expenses of the Company business. The Company may set aside funds for any items that are proper Company purposes, as determined by the Board of Managers.

4. CASH DISTRIBUTIONS; ALLOCATIONS OF PROFITS AND LOSSES

(a) Distributions. All cash of the Company available for distribution shall be distributed to the Member at such times and in such amounts as the Board of Managers may determine.

(b) Allocations of Profits and Losses. All profits and losses of the Company shall be allocated to the Member.

5. RIGHTS AND POWERS OF THE MEMBER; BOARD OF MANAGERS.

(a) Management Rights Generally. The responsibility and control of the management and conduct of the Company's day-to-day activities and operations shall be vested in the Member, subject to Section 5(b) below.

(b) Board of Managers.

(i) The business and affairs of the Company shall be managed by or under the direction of a Board of Managers (the "Board of Managers") and all actions outside of the ordinary course of business of the Company, to be taken by or on behalf of the Company, shall require the approval of the Board of Managers. Except as otherwise provided in this Agreement, the Board of Managers shall have the duties, powers and rights of the board of directors of a corporation organized under the General Corporation Law of the State of Delaware (it being understood and agreed, nonetheless, that the individual Managers appointed by the Warrant Holder or the Class B Limited Partner(s) as provided below represent the interests of the Warrant Holder or the Class B Limited Partner(s)).

(ii) The Board of Managers shall consist of up to five individual Managers appointed by the Member and in no event may the Board of Managers consist of more than five Managers without the consent of the Class B Managers; provided, however, that in no event may the Board of Managers consist of more than five Managers unless not fewer than forty percent (40%) of the Managers are Class B Managers. Unless and until the Warrant Holder exercises its rights under the Warrant to purchase any Class B Limited Partner Units, the Member shall delegate its right to appoint two (2) of the Managers (or such greater number as required by the first sentence of this section) to the Warrant Holder, and upon the purchase by the Warrant Holder of any Class B Limited Partner Units pursuant to the Warrant, the Member shall delegate its right to appoint two (2) of the Managers (or such greater number as required by the first sentence of this section) to the Class B Limited Partner(s). If there is more than one Class B Limited Partner, then the right to appoint two (2) of the Managers (or such greater number as

- 4 -

required by the first sentence of this section) will be vested solely in the Class B Limited Partner that supervises editorial and reportorial functions of The Charleston Daily Mail pursuant to Section 9.1 of the Partnership Agreement. Neither the Warrant Holder nor the Class B Limited Partner(s) may appoint current employees of the Joint Venture, the Member, the Company, the Partnership or Daily Gazette Publishing Company, LLC to represent it on the Board of Managers.

(iii) The Board of Managers shall only have the power and authority to act by the vote of the constituent Managers and no individual Manager, in the capacity of Manager, shall have the power or authority to act as the agent or representative of the Company or to otherwise bind the Company. Voting by the Managers shall be on a per capita basis. Actions may be taken by the Board of Managers by, but only by, a majority vote of the Managers; provided, however, that actions by the Board of Managers concerning (x) the budgeted Editorial Expenses (as that term is defined in the JOA) for The Charleston Gazette and The Charleston Daily Mail or (y) "news hole" and color usage allocations for The Charleston Gazette and The Charleston Daily Mail shall require the prior approval of at least 75% of the Managers (i.e., if the Board of Managers consists of four Managers, not fewer than three Managers must vote in favor of the particular action, and if the Board of Managers consists of five Managers, not fewer than four Managers must vote in favor of the particular action); provided further that no Manager appointed by the Warrant Holder or the Class B Limited Partner(s), as the case may be, shall participate in any decisions concerning the news, editorial policy or content of The Charleston Gazette or The Charleston Gazette-Mail or have any connection with the news and editorial operations of The Charleston Gazette or The Charleston Gazette-Mail, and all such decisions shall be made exclusively by the Managers appointed by the Member. Either the Member or, as applicable, the Warrant Holder or the Class B Limited Partner(s) may at any time, by written notice to the other, remove its Managers, with or without cause, and substitute Managers to serve in their stead. No Manager shall be removed from office, with or without cause, without the consent of the Person that designated such Manager. Each Manager appointed by the Warrant Holder or the Class B Limited Partner(s) may act (or refrain from acting), and the Warrant Holder or the Class B Limited Partner(s) may instruct such Managers, in their capacity as such, to act (or refrain from acting) solely according to the interests (or the perceived interests) of the Warrant Holder or the Class B Limited Partner(s) and none of the foregoing shall be deemed to breach any fiduciary duty that, pursuant to this Agreement or at law or in equity, the Warrant Holder or the Class B Limited Partner(s) otherwise would be deemed to have to the Company, the Partnership or the Member. The Board of Managers shall hold such meetings no less frequently than once per calendar quarter and at such times and places as shall be determined by the Managers. Special meetings of the Board of Managers may be called at any time by agreement of the Managers. The Board of Managers may establish such procedures for the conduct of meetings as may be agreed by the Managers.

(c)     Officers. The Board of Managers may appoint such officers, from time to time, as the Board of Managers deems necessary and advisable.

(d)     Authority of the Member. Subject to the management of the business and affairs of the Company by the Board of Managers pursuant to Section 5(b) hereof, the Member shall have all powers necessary to manage and control the day-to-day activities and operations of the Company.

(e)     Admission of Additional Members. The Member, in its discretion, may admit additional members to the Company on terms and conditions agreed to by the Member and the Person being admitted as an additional member; provided, however, that the Board of Managers shall not consist of more than five Managers without the consent of the Class B Managers and in no event may the Board of Managers consist of more than five Managers if fewer than forty percent (40%) of the Managers are Class B Managers.

(f)     Limitation of Liability of the Member and Managers. The debts, obligations, and liabilities of the Company, whether arising in contract, tort, or otherwise, shall be solely the debts, obligations, and liabilities of the Company; and the Member and the Managers shall not be obligated personally for any such debt, obligation, or liability of the Company solely by reason of being the Member or a Manager, except and only to the extent as otherwise expressly required by law.

(g)     Indemnification.

(i)     In any threatened, pending, or completed claim, action, suit, or proceeding to which the Member or a Manager was or is a party or is threatened to be made a party by reason of its activities on behalf of the Company, the Company shall indemnify and hold harmless such Member and Manager against losses, damages, expenses (including attorneys' and accountants' fees), judgments, and amounts paid in settlement actually and reasonably incurred in connection with such claim, action, suit, or proceeding, except that the Member and the Managers shall not be indemnified for actions constituting the improper receipt of personal benefits, willful misconduct, recklessness, or gross negligence with respect to the business of the Company; provided, however, that to the extent the Member or a Manager has been successful on the merits or otherwise in defense of any action, suit, or proceeding to which it was or is a party or is threatened to be made a party by reason of the fact that it was or is a Member or Manager of the Company, or in defense of any claim, issue, or matter in connection therewith, the Company shall indemnify such Member and Manager and hold him harmless against the expenses (including attorneys' and accountants' fees) actually incurred by such Member and Manager in connection therewith.

(ii)     Expenses (including attorneys' and accountants' fees) incurred in defending a civil or criminal claim, action, suit, or proceeding shall be paid by the Company in advance of the final disposition of the matter upon receipt of an undertaking by or on behalf of the Member or a Manager to repay such amount if such Member or Manager is ultimately determined not to be entitled to indemnity.

(iii) For purposes of this Section 5(g), the termination of any action, suit, or proceeding by judgment, order, settlement, or otherwise adverse to the Member or a Manager shall not, of itself, create a presumption that the conduct of such Member or Manager constitutes willful misconduct, recklessness, or gross negligence with respect to the business of the Company.

6.     PERMITTED TRANSACTIONS

(a)     Other Businesses. The Member, the Managers and their respective affiliates, agents, and representatives, may engage in or possess an interest in other business ventures of any nature or description, independently or with others, whether currently existing or hereafter created and whether or not competitive with or advanced by the business of the Company. The Company shall not have any rights in or to the income or profits derived therefrom.

(b)     Transactions with the Company. The Company may, in the sole discretion of the Board of Managers, contract with any Person (including the Member or any Person affiliated with the Member or in which the Member may be interested) for the performance of any services which may reasonably be required to carry on the business of the Company, and any such Person dealing with the Company, whether as an independent contractor, agent, employee, or otherwise, may receive from others or from the Company profits, compensation, commissions, or other income incident to such dealings.

7.     ASSIGNMENT, TRANSFER, OR SALE OF INTERESTS IN THE COMPANY

Subject to the Put/Call Agreement, the Company may sell, assign, pledge, or otherwise encumber or transfer all or any part of its interest in the Company to any Person.

8.     DISSOLUTION AND TERMINATION OF THE COMPANY

(a)     Events of Dissolution. The Company shall dissolve upon the earlier to occur of:

(i)     an election to dissolve the Company made by the Board of Managers, subject to any restriction in any agreement to which the Company is a party; or

(ii)     the happening of any event that, under the Act, causes the dissolution of a limited liability company.

(b)     Actions on Dissolution. Upon the dissolution of the Company, the Board of Managers shall act as liquidator to wind up the Company. The proceeds of liquidation shall be applied first to the payment of the debts and liabilities of the Company (including any loans to the Company made by the Member), the expenses of liquidation, and the establishment of any reserves that the liquidator deems necessary for potential or contingent liabilities of the Company. Remaining proceeds shall be distributed to the Member as provided in Section 4(a). Upon the dissolution and winding up of the Company, the liquidator shall file a certificate of cancellation with the Secretary of State of Delaware in accordance with Section 18-203 of the Act. Upon the completion of the distribution of Company assets and the proceeds of liquidation as provided in this Section 8(b), the Company shall be terminated.

9.     BOOKS, RECORDS, AND RETURNS

(a)     Books of Account and Records. A copy of this Agreement and any other records required to be maintained by the Act shall be maintained at the principal office of the Company at the location specified in Section 2(g). All such books and records shall be available for inspection and copying by the Member or its duly authorized representatives during ordinary

business hours. The Company shall keep accurate books and records of the operation of the Company which shall reflect all transactions, be appropriate and adequate for the Company's business and for carrying out the provisions of this Agreement.

(b) Deposit of Company Funds. All revenues, assessments, loan proceeds, and other receipts of the Company will be maintained on deposit in interest-bearing and non-interest bearing accounts and other investments as the Board of Managers deems appropriate.

10. MISCELLANEOUS

(a) Captions. All section or paragraph captions contained in this Agreement are for convenience only and shall not be deemed part of this Agreement.

(b) Pronouns, Singular and Plural Form. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, and neuter as the identity of the Person or Persons referred to may require, and all words shall include the singular or plural as the context or the identity of Persons may require.

(c) Further Action. The parties shall execute and deliver all documents, provide all information, and take, or forbear from, all actions that may be necessary or appropriate to achieve the purposes of this Agreement.

(d) Entire Agreement. Except as to matters with respect to which additional agreements are referenced herein, this Agreement contains the entire understanding among the parties and supersedes any prior understandings and agreements between them regarding the subject matter of this Agreement.

(e) Agreement Binding. This Agreement shall be binding upon the successors and assigns of the parties.

(f) Severability. If any provision or part of any provision of this Agreement shall be invalid or unenforceable in any respect, such provision or part of any provision shall be ineffective to the extent of such invalidity or unenforceability only, without in any way affecting the remaining parts of such provision or the remaining provision of this Agreement.

(g) Counterparts. This Agreement may be signed in counterparts with the same effect as if the signature on each counterpart were upon the same instrument.

(h) Governing Law. This Agreement shall be governed, construed, and enforced in accordance with the laws of the State of Delaware (without regard to the choice of law provisions thereof).

(i) Amendment. This Agreement shall not be amended without the prior written consent of the Warrant Holder or, if applicable, the Class B Limited Partner(s).

(j) No Third-Party Beneficiaries. With the exception of the Warrant Holder, the Class B Limited Partner(s) and the Class B Managers, this Agreement is not intended to, and

shall not be construed to, create any right enforceable by any Person not a party hereto, including any creditor of the Company or of the Member.

IN WITNESS WHEREOF, the undersigned have executed this Agreement to be effective as of the date first above written.

DAILY GAZETTE COMPANY

By: _____
        Elizabeth B. Chilton
        President

DAILY GAZETTE HOLDING COMPANY, LLC

By:    Daily Gazette Company, its sole member

By: _____
        Elizabeth B. Chilton
        President

SECOND AMENDED AND RESTATED

JOINT OPERATING AGREEMENT

BY AND AMONG

DAILY GAZETTE COMPANY,

A WEST VIRGINIA CORPORATION;

DAILY GAZETTE HOLDING COMPANY, LLC,

A DELAWARE LIMITED LIABILITY COMPANY;

CHARLESTON NEWSPAPERS,

A WEST VIRGINIA UNINCORPORATED JOINT VENTURE;

CHARLESTON NEWSPAPERS HOLDING, L.P.,

A DELAWARE LIMITED PARTNERSHIP;

DAILY GAZETTE PUBLISHING COMPANY, LLC,

A DELAWARE LIMITED LIABILITY COMPANY;

AND

CHARLESTON PUBLISHING COMPANY,

A DELAWARE CORPORATION

_____, 2009

THIS SECOND AMENDED AND RESTATED JOINT OPERATING

AGREEMENT (this "JOA") is dated as of _____, 2009 by and among Daily Gazette Company, a West Virginia corporation ("DGC"); Daily Gazette Holding Company, LLC, a Delaware limited liability company ("DGHC"); Charleston Newspapers, a West Virginia unincorporated joint venture (the "Joint Venture"); Charleston Newspapers Holdings, L.P., a Delaware limited partnership (the "Limited Partnership"); Daily Gazette Publishing Company, LLC, a Delaware limited liability company ("DGPC"); and Charleston Publishing Company, a Delaware corporation ("CPC").

WHEREAS, DGHC, the Joint Venture, the Limited Partnership, DGPC and CPC previously entered into an Amended and Restated Joint Venture Agreement dated as of May 7, 2004 (the "Prior JVA"), pursuant to which the Joint Venture prior to the date hereof managed and operated The Charleston Gazette ("Gazette"), The Sunday Gazette-Mail ("Gazette-Mail") and The Charleston Daily Mail ("Mail") (collectively, the "Newspapers" and individually a "Newspaper"), except for the news and editorial departments of Gazette and Gazette-Mail, on one hand, and Mail, on the other, which have remained separate and independent;

WHEREAS, simultaneously with the execution of this agreement, DGC and CPC and certain affiliated parties are effectuating certain transactions relating to the ownership and management of the Joint Venture and which are described herein;

WHEREAS, DGC, CPC, DGHC, DGPC, the Limited Partnership and the Joint Venture desire to amend various provisions of the Prior JVA, to restate it in its entirety and to supplement it, as herein provided;

WHEREAS, the purpose and intent of the JOA is to provide a plan of common operation of the Newspapers, so as to (1) provide efficient newspaper operations, (2) produce high quality newspapers that are attractive to readers and advertisers and (3) maintain the separate identities and free editorial and news voices of the Newspapers; and

WHEREAS, the JOA will continue to maintain as separate and independent the respective news and editorial operations of the Newspapers consistent with the requirements of the Newspaper Preservation Act, 15 U.S.C. § 1801 et seq.;

NOW THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the parties hereby agree as follows:

I. THE LIMITED PARTNERSHIP

A. General. On May 7, 2004, a limited partnership (the "Limited Partnership") was formed by DGHC, as the sole General Partner, CPC, as the sole Class A Limited Partner, and ABRY/Charleston, Inc., as the sole Class B Limited Partner. Prior to the date hereof, ABRY/Charleston, Inc.'s entire interest as a Class B Limited Partner in the Limited Partnership was redeemed by the Partnership. Simultaneously herewith, the Limited Partnership is granting to CPC (in its capacity as the holder of the Warrant and any permitted transferee of the Warrant, the "Warrant Holder") a warrant (the "Warrant") to subscribe for and purchase up to an aggregate number of Class B Limited Partner Units in the Limited Partnership that constitute a twenty percent (20%) Percentage Interest (as defined in the Amended and Restated Limited Partnership Agreement of the Limited Partner dated as of the date hereof (the "Limited Partnership Agreement"), by and among DGHC and CPC, the Limited Partnership) as of the date of exercise, subject to adjustment as provided therein.

- 2 -

B.     <u>Future Capital Contributions; Capital Assets</u>. CPC and any other limited partners of the Limited Partnership shall have no obligation to make any further contributions to the capital of the Limited Partnership. DGHC shall in the future make such additional contributions to the capital of the Limited Partnership as shall be necessary in its reasonable judgment to (1) fund acquisitions of capital assets necessary for the business and operations of the Limited Partnership and/or the Joint Venture; (2) fund acquisitions of capital assets necessary for the business and operations of the editorial departments of each of the Newspapers to the extent such editorial departments' tangible capital assets on the date hereof require supplementation or replacement, (3) provide the Limited Partnership and the Joint Venture with adequate working capital, and (4) ensure that the Limited Partnership and the Joint Venture have adequate funds to make on a timely basis the cash distributions and payments contemplated by Section V J (1) through (4) of this JOA. DGHC may from time to time cause the Limited Partnership or the Joint Venture to distribute and transfer to it one or more capital assets of the Limited Partnership so long as after such transfer the Limited Partnership and the Joint Venture shall have, as a result of their remaining capital assets and any other capital assets which DGHC shall at the time contribute or make available to the Limited Partnership and/or the Joint Venture pursuant hereto, capital assets whose adequacy and suitability for the Limited Partnership's and/or the Joint Venture's performance of the business and operations of the Newspapers are substantially the same as prior to such transfer.

C.     <u>Management of Partnership and General Partner</u>. The Limited Partnership shall be managed exclusively by DGHC as the General Partner of the Limited Partnership. The members of DGHC have delegated the management of DGHC to a board of managers consisting of up to five individual managers, and in no event may the board of managers consist of more than five

- 3 -

managers without the consent of the managers appointed pursuant to Section 5(b) of the Operating Agreement of DGHC by the Warrant Holder or the Class B Limited Partner(s), as applicable; provided, however, that in no event may the board of managers consist of more than five managers unless not fewer than forty percent (40%) are appointed by the Warrant Holder or the Class B Limited Partner(s), as applicable. DGC will appoint the members of DGHC's board of managers; provided, however, that until and unless the Warrant Holder exercises its rights under the Warrant and purchases any Class B Limited Partner Units, DGC will delegate to the Warrant Holder the right to appoint two (2) of the members of DGHC's board of managers (or such greater number as required by Section 5(b)(ii) of the Operating Agreement of DGHC) and, upon the purchase by the Warrant Holder of any Class B Limited Partner Units pursuant to the Warrant, DGC will delegate to the Class B Limited Partner(s) the right to appoint two (2) of the members of DGHC's board of managers (or such greater number as required by Section 5(b)(ii) of the Operating Agreement of DGHC). If there is more than one Class B Limited Partner, then the right to appoint two (2) of the members of DGHC's board of managers (or such greater number as required by Section 5(b)(ii) of the Operating Agreement of DGHC) will be vested solely in the Class B Limited Partner that supervises editorial and reportorial functions of the Mail pursuant to Section V H hereof. The Warrant Holder or the Class B Limited Partner(s), as applicable, may not appoint any person who is, at the time of his or her appointment, an employee of the Joint Venture, DGC, DGHC, the Limited Partnership or DGPC to represent it on DGHC's board of managers.

II.     THE JOINT VENTURE

A.      Continuation of Joint Venture. By this JOA, the Limited Partnership and DGPC shall continue the conduct of a joint venture for the publication of the Newspapers; provided (1)

- 4 -

that there shall continue to be no merger, combination or amalgamation of the editorial or reportorial staff of Gazette and Gazette-Mail, on the one hand, and Mail, on the other hand, (2) that CPC shall continue to independently determine the editorial, news policy and content of Mail and (3) that DGHC shall continue to independently determine the editorial, news policy and content of Gazette and Gazette-Mail.

B.    Name and Place of Business. The Joint Venture shall continue to be conducted under the name "Charleston Newspapers" from its place of business at 1001 Virginia Street, East, City of Charleston, County of Kanawha, State of West Virginia.

C.    Ownership of and Title to Property. All of the parties hereto hereby confirm and agree that the ownership of and title to all real property and all tangible personal property used in and useful to the Joint Venture is exclusively in the Joint Venture rather than in any other party to this JOA, jointly or individually, and without regard to whether any property was contributed by any party to this JOA to the Joint Venture, was otherwise made available to the Joint Venture by any party to this JOA or was otherwise acquired by the Joint Venture, except that certain property is owned by G.M. Properties, Inc., a West Virginia corporation, of which all the outstanding shares are owned by the Joint Venture.

D.    Revenues, Expenses and Obligations. The Joint Venture shall receive all income and revenues of the Joint Venture and shall pay all expenses incurred or assumed by it. No party hereto shall be or shall become liable upon any contract or other obligation of the Joint Venture or any other party hereto, unless such party shall expressly assume such contract or other obligation or liability is imposed by law.

E.    Management of Joint Venture. Subject to the provisions of this JOA concerning the editorial independence of the Newspapers and such other limitations as are expressly set forth

- 5 -

in this JOA or the Limited Partnership Agreement, the Limited Partnership shall have complete authority over and exclusive control and management of the business and affairs of the Joint Venture. The Limited Partnership may delegate such general or specific authority to the officers and employees of the Joint Venture with respect to the business and day-to-day operations of the Joint Venture as it may from time to time consider desirable, and the officers and employees of the Joint Venture may exercise the authority granted to them. The Joint Venture shall indemnify, defend and hold harmless DGPC and the Limited Partnership and its partners (and their respective shareholders, members, partners, directors, managers, officers, employees and agents) from any liability, loss or damage suffered by them by reason of any act or omission by them in connection with the business of the Joint Venture; provided, however, that indemnification shall not be available for any claim that results from the willful misconduct of such person or the breach by such person of its obligations under this JOA or other agreements to which such person may be subject. The Limited Partnership shall not be liable, in damages or otherwise, to the Joint Venture or its direct or indirect partners for any act or omission in the absence of willful misconduct.

III.     EDITORIAL INDEPENDENCE

Preservation of the editorial independence of the Newspapers is the essence of this JOA. DGHC and CPC each agree to strictly maintain the separateness of their respective limited liability company and corporate identities, as the case may be, and to retain the editorial independence of Gazette and Gazette-Mail, on the one hand, and Mail, on the other hand. CPC agrees that neither it nor any affiliate shall have any connection with the news or editorial operations of Gazette or Gazette-Mail. The separate editorial and reportorial staffs of Gazette and Gazette-Mail, on the one hand, and Mail, on the other hand, shall be independent and shall not be

merged, combined or amalgamated, and their editorial policies shall be independently determined. DGHC agrees that neither it nor any affiliate shall have any connection with the news or editorial operations of <u>Mail</u>. Actions of DGHC with respect to <u>Mail</u> shall be confined exclusively to its role as General Partner of the Limited Partnership and in such role to cause the Joint Venture to print, sell and distribute the Newspapers, and to solicit and sell advertising space therein, and to perform such other functions as are described in this JOA.

IV.     <u>TERM</u>

Unless sooner terminated in accordance with the terms hereof, this JOA shall continue in effect from the date hereof through the close of business on June 30, 2024. This JOA shall thereupon be automatically renewed for additional five-year terms unless any party hereto gives written notice to the contrary to each of the other parties hereto at least 12 months prior to the end of the then-current term.

V.      <u>CONTINUING OPERATIONS</u>

A.      <u>General</u>. On and after the date hereof the Joint Venture shall control, supervise, manage and perform all operations (other than the news and editorial operations of the Newspapers) involved in producing, printing, selling and distributing the Newspapers; to determine press runs, press times, page sizes and cutoffs of the Newspapers; to determine whether supplemental products will be distributed in or with one or more Newspapers, including whether and how certain products will be distributed to non-subscribers; to purchase newsprint, materials and supplies as required; to solicit and sell advertising space in the Newspapers; to collect the Newspapers' circulation and advertising accounts receivable; to provide or make available to each Newspaper such parking, subscriptions, messenger services, and data processing services as are reasonable and appropriate (the costs for which shall be borne by the

- 7 -

Joint Venture and which shall not be an Editorial Expense); and to make all determinations and decisions and do any and all acts and things necessarily connected with the foregoing activities, including maintaining insurance coverage that is normal and appropriate for similarly-situated businesses. The parties recognize that DGHC as General Partner of the Limited Partnership shall have general charge and supervision of the business of the Newspapers, but shall treat each of the Newspapers as separate and distinct editorial products, and shall have no duties or authority with respect to the news or editorial functions of Mail.

B. Production. On and after the date hereof, the Joint Venture shall print the Newspapers on equipment owned or leased by the Joint Venture in plant or plants located at such place or places as the Joint Venture may determine, and all operations under this JOA, except the operation of the Newspapers' editorial departments, shall be carried on and performed by the Joint Venture with equipment from the Joint Venture's plant or plants or by independent contractors or agents selected by the Joint Venture. During the term of this JOA, CPC agrees to produce Mail's editorial and news copy, and DGHC agrees to produce Gazette's and Gazette-Mail's editorial and news copy, on equipment which is provided by the Joint Venture or which is compatible with the equipment used by the Joint Venture in its production facilities.

C. Advertising and Circulation.

(1) In general and subject to the exceptions set forth in clauses (a) through (d) below, the Joint Venture shall have complete control of and the right to determine the advertising and circulation rates for each of the Newspapers, and the Joint Venture shall use its reasonable efforts to sell advertising space in each Newspaper and to sell, promote and distribute each Newspaper as widely as practicable, consistent, however, with the objective of enhancing the overall economic performance of the Joint Venture and the Newspapers considered together in a

- 8 -

manner that does not have a material adverse impact on the cash flow of the Joint Venture and the ability of the Joint Venture to make on a timely basis the cash distributions to the Limited Partnership and the payments to CPC contemplated by Section V J (1) through (4) hereof.

      (a)      The Joint Venture may not reduce the primary circulation area of Mail as of August 1, 2009 without CPC's approval.

      (b)      For a six month period commencing within a reasonable time after the date hereof, the Joint Venture will promote Mail by offering subscriptions at a 50% discounted rate. This promotion will be applicable solely to Mail.

      (c)      Except as set forth in clause (b) above or as otherwise approved by CPC, the Joint Venture will offer the same promotions for Mail and Gazette to potential subscribers.

      (d)      The Joint Venture will not discriminate against Mail in advertising, promotions or other sales or marketing efforts.

      (2)      The Joint Venture shall be free to select and alter from time to time the national advertising representative(s) for each of the Newspapers and the commission payable to such national advertising representative(s) and any other terms of such arrangement(s) shall be determined by the Joint Venture; provided, however that the Joint Venture will not discriminate against Mail in advertising, promotions or other sales or marketing efforts.

      (3)      The Joint Venture will pay to each of the Publisher of Mail and the Circulation Director of the Joint Venture a bonus for increases in Mail's average daily paid print circulation (as stated in the most recent six month audit conducted by the Audit Bureau of Circulations or other reputable third party media auditor). If the average daily paid print circulation of Mail for a six month audit period is greater than the average daily paid print

- 9 -

60827386_1.DOCX

circulation for the immediately preceding six month audit period, the bonus will be $3.00 per each additional subscriber and will be paid within a reasonable time after the Joint Venture receives the applicable six month audit.

D.    Publication Schedule. DGHC shall publish Gazette daily on weekdays and Saturday mornings and Gazette-Mail on Saturday and Sunday mornings, and CPC shall publish Mail daily on weekday mornings. The Joint Venture will not change the press deadlines, delivery targets, number of editions and days of publication of Mail without CPC's approval. If at any time DGHC determines in the good faith exercise of business judgment as General Partner of the Limited Partnership that the continuation of any scheduled publication of any edition(s) of Gazette or Gazette-Mail is no longer in the best interests of those Newspapers and the Joint Venture considered together, then, subject to the Newspaper Preservation Act, 15 U.S.C. § 1801 et seq. (the "Act"), within thirty days after written notice by the Limited Partnership to CPC, the scheduled publication of such edition(s) may be discontinued. The Joint Venture will not discontinue publication of Mail without CPC's approval unless (i) the incremental revenue from Mail fails to cover Mail's incremental costs and the discontinuation of Mail can be effected by satisfying the failing firm test as applicable to joint operating agreement newspapers under the Act and (ii) the U.S. Department of Justice approves the discontinuation of publication of Mail.

E.    Office Space and Equipment. On and after the date hereof, the Joint Venture shall furnish reasonably adequate office space for the separate use of the editorial departments of the Gazette, on the one hand, and Mail on the other hand. Such space shall be furnished with furniture and equipment which in the Joint Venture's reasonable judgment is sufficient and technologically adequate for each Newspaper's news and editorial operations.

- 10 -

F.     Other Services. The parties recognize that in addition to the operations with respect to the Newspapers contemplated by this JOA, the Joint Venture may also utilize its production and other facilities, personnel, and agents for any other lawful activities it may deem appropriate, including distributing news, advertising or other information to non-subscribers; distributing or making available all or a portion of the information or advertising in the Newspapers to subscribers by means of electronic distribution, microfilm, microfiche or mail; commercial printing, including commercial printing of other newspapers; distribution services; and any other activities not inconsistent with its principal business; provided, however, that such activities shall not unreasonably interfere with the printing or distribution of the Newspapers.

G.     Future Purchases. On and after the date hereof, subject to Section V H, the Joint Venture shall be responsible for the purchase of all inventory, supplies, equipment and services as it deems to be necessary or desirable in connection with the operation of the Newspapers and other functions as are described in this JOA. In the event of shortages of inventory, supplies, equipment or services, no Newspaper shall be unfairly favored or discriminated against as regards the other.

H.     News and Editorial Matters. DGHC and CPC shall furnish complete news and editorial services necessary and appropriate for the publication of their respective Newspapers in the manner provided in this JOA.

(1)     Each of DGHC and CPC shall have complete and exclusive control and direction of the editorial department and editorial policies of its respective Newspapers and shall be responsible for and shall bear all of its respective Editorial Expense (as defined below). Without limiting the generality of the foregoing, each of DGHC and CPC shall have the exclusive right to determine the editorial format, dress, makeup and news and feature content of

- 11 -

its respective Newspapers (including the content of all advertisements and advertising matter), and each shall have complete control and authority over the editors and editorial department staff of its respective Newspapers (including the exclusive authority to determine the number, identity and salaries of the editorial department of its respective Newspapers and to make hiring and firing decisions, so long as the Editorial Expense for each Newspaper does not exceed the budgeted amount for such Newspaper for the applicable year determined in accordance with Section V J(8) below). The term "editorial department" as used herein shall include the news, editorial, editorial promotion and photographic functions of the applicable Newspaper. DGHC and CPC each recognize the importance of the editorial quality of their respective Newspapers and each of them agrees to use reasonable efforts to provide editorial products for their Newspapers which are compatible with the needs of the Charleston, West Virginia area newspaper market and to preserve with respect to their Newspapers a high standard of newspaper quality and journalistic excellence.

(2) The amount of reading content (sometimes known as "news hole") and the amount of color usage of each of the Newspapers shall be determined by the board of managers of the Limited Partnership during the annual budgeting process; provided, however, that the news hole and color usage allocations will be budgeted at the same level for both Mail and Gazette. Each Newspaper may elect to publish pages in excess of their news hole and/or exceed the amount of color usage determined for such Newspapers by the Joint Venture, provided the Joint Venture has the production capacity to accommodate such excesses. However, if any of the Newspapers exceeds its budgeted news hole allocation or color usage, then any newsprint and other production costs attributable to such excess shall be borne by such Newspaper, and upon being invoiced therefor by the Joint Venture, DGHC or CPC, as appropriate, shall reimburse the

- 12 -

Joint Venture for such expense. If, from time to time following the determination by the Joint Venture of the news hole allocation, the Joint Venture shall require a greater news hole allocation for one or more editions of one or more of the Newspapers, the Newspapers shall have no obligation to reimburse the Joint Venture for any additional expense the Joint Venture may incur as a consequence thereof, and the Joint Venture shall reimburse the Newspapers promptly upon being invoiced therefor for any additional expenses the Newspapers may incur as a consequence thereof.

(3)     DGHC, independently of CPC, shall develop standards for determining the acceptability of advertising copy for publication in Gazette and Gazette-Mail. CPC, independently of DGHC and the Joint Venture, shall develop standards for determining the acceptability of advertising copy for publication in Mail.

(4)     Except as provided otherwise herein, the term "Editorial Expense" as used in this JOA shall mean all costs and expenses associated with the news and editorial departments of each Newspaper, including but not limited to: (a) compensation, including payroll taxes, retirement, pension, health and death benefits, worker's compensation insurance and group insurance of news and editorial employees; (b) severance pay of news and editorial employees; (c) travel and other expenses of news and editorial employees; (d) press association assessments and charges; (e) charges for news services and editorial wire services; (f) charges for the right to publish news and editorial features, daily or weekly comics and other editorial material of every kind and character; (g) the cost of news and editorial materials, printing, stationery, office supplies and postage for the news and editorial department; (h) donations; (i) the cost of editorial promotions; (j) telegraphic, telephone, long-distance telephone and internet access charges of the news and editorial departments; (k) charges for the purchase, rental, repair and maintenance of

editorial department cameras and related photographic equipment (provided, however, that the term "Editorial Expense" shall not include any cost, charge or expense related to any camera or other equipment made available to the editorial departments of the Newspapers pursuant to Section V E of this JOA, or to any equipment that is an integral part of the production process even though located in the news and/or editorial department of a Newspaper, or related to any editorial department capital assets owned by either Newspaper); (l) the cost of liability insurance and insurance with respect to libel and right of privacy and similar hazards; and (m) the cost of any Charleston, West Virginia based executive-level management of Mail. Notwithstanding the foregoing, the following shall not be included in the term "Editorial Expense" and shall be separately borne by the Newspaper which incurs them: (i) certain uninsured liabilities for published or excluded material as provided in Section VII B, (ii) costs for excess news hole allocation or color usage as provided in Section V H(2), (iii) costs related to material changes from present, usual or customary practices as provided in Section V H(5), (iv) any interest, indebtedness, amortization, organizational costs or other costs or expenses relating to Mail and (v) except as described in (m) above, any portion of any salaries, expenses, overhead or corporate allocation attributable to any non-Charleston, West Virginia based ownership, management or supervision of Mail.

(5)     All Editorial Expense of the editorial departments of Gazette and Gazette-Mail shall be borne by DGHC, and all Editorial Expense of the editorial department of Mail shall be borne by CPC; provided, however, that costs resulting from any material change by any Newspaper from its present, usual or customary practices that result in additional future newsprint, production or other costs to be incurred on the part of the Joint Venture shall be borne

- 14 -

by such Newspaper, and upon being invoiced therefor by the Joint Venture, DGHC or CPC, as appropriate, shall reimburse the Joint Venture for such costs.

I.    Accounting Matters. The Joint Venture shall cause to be maintained full and accurate books of account and records showing all transactions hereunder. Such books and records shall be kept on the basis of a year ending December 31 and under the accounting methods currently employed by DGC in accordance with generally accepted accounting principles, and shall at all times be kept at the principal place of business of the Joint Venture. The independent auditors of the Joint Venture shall be the independent auditors of DGC. Any changes in accounting method shall be consistent with accepted accounting principles and with changes made generally by DGC, and CPC shall receive prompt notice of any such changes that could reasonably be expected to have an adverse effect on its interests under this JOA or the Limited Partnership Agreement. CPC and its respective authorized agents or representatives shall have access to and may inspect such books and records at any time and from time to time during ordinary business hours. Statements shall be rendered and settlements under this JOA shall be made on a monthly basis on the 15th day following the end of each monthly accounting period, with annual adjustments as soon as practicable at the conclusion of each year during the term of this JOA. An annual statement shall be furnished by the Joint Venture to the Limited Partnership not later than the 31st day of March of each year, summarizing in reasonable detail and fairly reflecting the transactions and the results of operations under this JOA during the preceding year. All payments shown to be due by CPC, DGHC or the Joint Venture shall be paid within thirty (30) days after the delivery of the applicable statement.

J.    Distributions to Partners.

(1)    For each year of this JOA, the Joint Venture shall distribute to the Limited Partnership cash equal to the amount actually expended or accrued as a current liability in accordance with generally accepted accounting principles by CPC for Editorial Expenses during such year; provided, however, that the amount distributed by the Joint Venture to the Limited Partnership pursuant to this Section V J(1) shall not, in respect of any year, exceed the budgeted amount for such year determined by the Joint Venture in accordance with Section V J(8) below; and provided further that the amount to be distributed by the Joint Venture to the Limited Partnership shall be reduced by any obligation of CPC to reimburse the Joint Venture for expenses paid by the Joint Venture on behalf of CPC. The Limited Partnership shall in turn distribute such net amount to CPC.

(2)    If, for any year, with the prior written concurrence of the Joint Venture, CPC makes a permanent reduction in its editorial workforce in accordance with the requirements of applicable laws, regulations and agreements, and if and to the extent the severance costs associated with such reduction are not included in CPC's applicable budgeted Editorial Expenses for such year determined in accordance with Section V J(8) below, then (a) the Joint Venture shall, in addition to the cash amounts described in subsection (1) above, distribute to the Limited Partnership in cash an amount equal to that portion of such severance costs that is reasonable and required to be incurred for such year pursuant to applicable laws, regulations or agreements, and that in any event does not exceed the costs DGHC would have incurred if DGHC had made corresponding reductions.

(3)    The distributions described in subsection (1) above shall be made on a monthly basis in increments of 1/12 of the applicable budgeted amount determined by the Joint

- 16 -

Venture, subject to adjustment by the Joint Venture at the end of each year so that such aggregate distributions for the year are in such amounts as the Joint Venture shall determine (based on such records and evidence as the Joint Venture may request from CPC) are equal to the amounts expended or accrued by CPC for such year as provided in Section V J(8), but no greater than the budgeted Editorial Expenses of Mail for such year. The distributions described in subsection (2) above shall also be made on a monthly basis and shall be in such amounts as the Joint Venture shall determine (based on such records and evidence as the Joint Venture may request from CPC) are equal to the amounts expended or accrued by CPC for such period within the applicable budget amounts, with such subsequent adjustment as may be appropriate.

(4)     In addition to the distributions to the Limited Partnership and, in turn, to CPC provided for in Sections V J (1) — (3) above, there also shall be paid to CPC a fee for its services in the management and supervision of the news and editorial operations of the Mail. The management fee shall be paid on May 7 of each year during the term of this JOA (each date a "Payment Date"). The amount of the management fee payable on May 7, 2010 shall be $225,000. For each Payment Date after May 7, 2010, the management fee payable to CPC shall be $225,000 adjusted to reflect the aggregate change since May 7, 2010 in the Consumer Price Index. The "Consumer Price Index" for purposes of this JOA shall mean "The Consumer Price Index for All Urban Consumers (CPI-U) for the U.S. City Average for All Items, 1982-84 = 100" released by the U.S. Department of Labor, Bureau of Labor Statistics, or any similar replacement index. For each Payment Date after May 7, 2010, the management fee payable to CPC shall also be adjusted annually on a non-cumulative basis as follows:

(a)     If Mail's average daily paid print circulation for the most recent 12 month audited period exceeds the average daily paid print circulation for the immediately

preceding 12 month audited period by more than 1%, the management fee payable on such Payment Date will be increased by $25,000.

(b)     If Mail's average daily paid print circulation for the most recent 12 month audited period is the same as the average daily paid print circulation for the immediately preceding 12 month audited period or if Mail's average daily paid print circulation for the most recent 12 month audited period exceeds the average daily paid print circulation for the immediately preceding 12 month audited period by 1% or less, the management fee payable on such Payment Date will be increased by $10,000.

(c)     If Mail's average daily paid print circulation for the most recent 12 month audited period decreases by 1% or less from the average daily paid print circulation for the immediately preceding 12 month audited period, the management fee payable on such Payment Date will be decreased by $10,000 (provided that in no event will the management fee payable on any Payment Date be reduced to an amount below $225,000).

(d)     If Mail's average daily paid print circulation for the most recent 12 month audited period decreases by more than 1% from the average daily paid print circulation for the immediately preceding 12 month audited period, the management fee payable on such Payment Date will be decreased by $25,000 (provided that in no event will the management fee payable on any Payment Date be reduced to an amount below $225,000).

For purposes of the adjustments described in clauses (a) through (d) above, Mail's average daily paid print circulation will be determined based on 12 month audits conducted by the Audit Bureau of Circulations or other reputable third party media auditor.

(5)     Except for the foregoing distributions to the Limited Partnership, and except for such cash as the Limited Partnership may from time to time determine is necessary or

desirable to retain in the Joint Venture for working capital purposes, the Joint Venture shall (subject to any applicable contractual restrictions under the Joint Venture's financing arrangements) distribute all remaining cash (including without limitation the proceeds from any sale or disposition of Joint Venture capital assets) equally to the Limited Partnership and DGPC. Such distributions shall be made from time to time as determined by the Limited Partnership, but no such distributions shall be made at any time when the Joint Venture is not current in making the distributions to the Limited Partnership and the payments to CPC described in Section V J(l) through (4) hereof.

(6)     Pending the distributions contemplated by this Section V J, DGHC shall be authorized to manage the Joint Venture's cash pursuant to the corporate-wide policies of DGC.

(7)     All income, gain, profits, losses, and expenses of the Joint Venture shall be allocated between the Limited Partnership and DGPC in proportion to the cash distributed to them pursuant to this Section V J.

(8)     For each year of this JOA, the budgeted Editorial Expenses for <u>Mail</u> and <u>Gazette</u> shall be in amounts determined by the board of managers of DGHC and approved by at least 75% of the members of the board of managers (i.e., if the board consists of four members, not fewer than three members must vote in favor, and if the board consists of five members, not fewer than four members must vote in favor); provided, however that for <u>Mail</u>'s 2010 annual Editorial Expense budget the staffing level in <u>Mail</u>'s news and editorial departments will be budgeted at thirty-two (32) full time employees. Any Editorial Expense budget may be adjusted by action of the board of managers of DGHC (subject to the 75% supermajority voting requirement) from time to time during the course of a year of this JOA to take appropriate

- 19 -

account of developments in products or technologies, material changes in any Newspaper's editorial workforce, or other material changes which may occur relative to any Newspaper's operations or circulation in any given year.

VI.    TERMINATION

    A.    Termination.

      (1)    If DGHC or CPC defaults by failing to make any payment hereunder when due or by otherwise failing to fulfill in any material respect any of its obligations under this JOA and the party in default does not correct its default within ninety (90) days after receipt from the other of written notice specifying the default, then the non-defaulting party may, at its election, terminate this JOA upon ninety (90) days' prior written notice.

      (2)    If publication of Mail is discontinued in accordance with the terms of this JOA or the Limited Partnership is dissolved, terminated and liquidated, this JOA shall terminate.

    B.    Action After Termination.

      (1)    It is understood that, as soon as practicable after the termination of this JOA by lapse of time or otherwise, the Limited Partnership shall, subject to the prior satisfaction of the claims of all creditors (other than the partners of the Limited Partnership) and the payment of the fee provided in Section V J(4), distribute to CPC, the Mail masthead, all trademarks, copyrights, trade names, service names and service marks of the Mail, the Mail subscriber and advertiser lists, print and electronic archives of the Mail, associated web sites and URLs (including "dailymail.com") and all legal rights associated with these assets, subject to such dispositions, additions or substitutions relating thereto which may have occurred in the ordinary course of the operations of the Limited Partnership or the Joint Venture or in satisfaction of the claims of creditors subsequent to the formation of the Limited Partnership, including, in

- 20 -

particular, any and all lists of subscribers to <u>Mail</u>, together with copies of any contracts with such subscribers relating to <u>Mail</u> and any executory contracts for the purchase of advertising in <u>Mail</u>, free and clear of any lien, encumbrance, right or interest (including any option or any license or other right of use) of or in favor of a third party, transfer restriction (including any right of first offer or refusal or similar provision) or any other similar right or interest whatsoever.

(2)     Upon the termination of this JOA by lapse of time or otherwise, the Joint Venture shall dissolve and shall distribute its assets as follows:

(a)     That portion of any distributions to which the Limited Partnership may be entitled but which has not yet been distributed for the period up to the date of termination pursuant to Section V J(1) through (3) hereof, shall be distributed to the Limited Partnership.

(b)     All other assets of the Joint Venture shall be distributed equally to DGPC and the Limited Partnership.

(3)     A partial accounting and partial settlement under this JOA shall be made as promptly as practicable and a final accounting and final settlement shall be made not later than the 31st day of March of the year following the year in which this JOA is terminated.

VII.     <u>MISCELLANEOUS PROVISIONS</u>

A.     <u>Certain Liabilities; Force Majeure</u>. Except as otherwise provided in this JOA, no party shall be charged with or held responsible for any contract, debt, claim, demand, damage, suit, action, obligation or liability arising by reason of any act or omission on the part of any other party, and no party shall be liable to any other for any failure or delay in performance under this JOA occasioned by war, riot, act of God or the public enemy, strike, labor dispute, shortage of any supplies, failure of supplier or workmen, or any cause beyond the control of the party required to perform, and such failure or delay shall not be considered a default hereunder.

- 21 -

B.    <u>Liabilities for Published or Excluded Material</u>. The Joint Venture shall obtain insurance to insure each of the Newspapers against liability for libel and right of privacy in such amount as it deems appropriate, with the premiums for such insurance being an Editorial Expense as provided in Section V H(4). However, the entire cost and expense of defending, settling, paying and discharging any liability or other claim which is not covered by the libel insurance obtained by the Joint Venture (excluding any such cost or expense which is not covered as a result of the application of any deductible amount or co-payment requirement provided under the insurance policy) for <u>Gazette</u> and <u>Gazette-Mail</u> on account of anything published in or excluded from <u>Gazette</u> or <u>Gazette-Mail</u>, or arising by reason of anything done or omitted to be done by the editorial departments thereof, shall be borne by DGHC; and any similar cost and expense on account of anything published in or excluded from <u>Mail</u>, or arising by reason of anything done or omitted to be done by the editorial department thereof, shall be borne by CPC. DGHC and CPC each agree to indemnify and hold the other party, the Joint Venture and the Limited Partnership harmless against any cost, expense or liability which such other party, the Joint Venture or the Limited Partnership may suffer or incur as a result of any such action or inaction for which the indemnifying party is responsible as provided above.

C.    <u>Contravention of Law</u>. Nothing contained in this JOA shall be construed to permit any party acting jointly or by unified action to engage in any predatory pricing, predatory practice or any other conduct which would be unlawful under any antitrust law as engaged in by any single entity. The parties hereto further mutually agree that if any part or provision of this JOA shall hereafter become, or be determined by action in any proper court to be, in contravention of law, this JOA shall not thereby be considered or adjudged to be a nullity, but that all parties shall, and each hereby agrees, immediately to take, or authorize such action to be

taken, to reform this JOA, or to modify, alter or supplement any of its provisions, as may be necessary to permit the intention and purpose of the parties hereto to be properly and lawfully carried out.

D.    Further Assurances. From time to time on and after the date hereof, each of the parties hereto will execute all such instruments and take all such actions as the other party shall reasonably request in connection with carrying out and effectuating the intention and purpose hereof and all transactions and things contemplated by this JOA, including, without limitation, the execution and delivery of any and all confirmatory and other instruments and the taking of any and all actions which may reasonably be necessary or desirable to complete the transactions contemplated thereby.

E.    Assignments and Transfers.

(1)    Except as authorized under the Limited Partnership Agreement, CPC may not sell, assign or transfer (including any pledge or hypothecation), any of its rights or interests under this JOA or pertaining to the Joint Venture or the Limited Partnership or the Newspapers to any person without the prior written consent of DGHC, which shall not be unreasonably withheld. Without limiting the generality of the foregoing, except as authorized under the Limited Partnership Agreement, a controlling interest in the capital stock of CPC may not be sold, assigned or transferred to any person without the prior written consent of DGHC, which shall not be unreasonably withheld. No consent of DGHC shall be required for a transfer relative to the Limited Partnership or any interests therein that is expressly authorized and made in compliance with the transfer provisions under the Limited Partnership Agreement, and, the foregoing transfer restrictions shall not apply to any transfer of any right or interest under this JOA or pertaining to the Joint Venture or the Newspapers to MNG or an affiliate of MNG so

- 23 -

long as MNG or an affiliate of MNG holds and maintains, directly or indirectly, voting control of such transferee following such transfer. CPC acknowledges and agrees that DGHC's ability to grant consent to a transfer is circumscribed by certain contractual restrictions under the Joint Venture's financing arrangements and the withholding of consent by DGHC in order to comply with these contractual restrictions will not be considered unreasonable.

(2)     DGC, DGHC, the Limited Partnership, DGPC and the Joint Venture may, without the consent of CPC, sell, assign or transfer a part or all or substantially all of the assets of Gazette and Gazette-Mail as a going concern to any person and assign a part or all of their rights and obligations under this JOA to the purchaser thereof, or sell, assign or transfer part or all of their direct or indirect interests in DGHC, the Limited Partnership, DGPC and the Joint Venture to any person, so long as (1) at the time of such sale the Joint Venture is current in the distributions required to be made to the Limited Partnership and the payments required to be made to CPC pursuant to Section V J(1) through (4) hereof, and (2) the purchaser assumes (in the case of an assets sale) all of the obligations of the assignors pursuant to this JOA. In the event DGC, DGHC, the Limited Partnership, DGPC or the Joint Venture engages in an assets sale contemplated by this Section VII E, they shall, effective on the closing thereof, be released and discharged from any further liability under this JOA. No consent of CPC shall be required for (i) a pledge by DGC, DGHC, the Limited Partnership, DGPC or the Joint Venture of their rights under this JOA or their direct or indirect interests in DGHC, the Limited Partnership, DGPC and the Joint Venture to the Joint Venture's lenders for security purposes or a transfer of such interests and rights pursuant to any foreclosure action by the Joint Venture's lenders or any transfer in lieu of foreclosure.

F.     Other Ventures. Neither DGC nor any Partner of the Limited Partnership may engage in other ventures in the Charleston, West Virginia market that are competitive with that of the Limited Partnership or any of its Subsidiaries (including the Joint Venture). For purposes of this Section VII F, any competitive venture undertaken by an affiliate of a Partner in the Charleston, West Virginia market will be deemed to be a competitive venture undertaken by such Partner.

G.     Entire Agreement. This JOA amends and restates the Prior JVA in its entirety.

H.     Notices. All notices, requests, demands, claims and other communications which may or are to be given hereunder or with respect hereto shall be in writing, shall be given either by personal delivery, facsimile or by certified or special express mail or recognized overnight delivery service, first class postage prepaid, or when delivered to such delivery service, charges prepaid, return receipt requested, and shall be deemed to have been given or made when personally received by the addressee, addressed as follows:

(1)     If to CPC, to:

Affiliated Media, Inc.
101 W. Colfax Avenue, Suite 1100
Denver, CO 80202
Attn: Joseph J. Lodovic, IV President
Facsimile: (303) 954-6320

With a copy to:

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004
Attn: James Modlin
Facsimile: (212) 422-4726

or such other addresses as CPC may from time to time designate.

(2)     If to DGC, DGHC, DGPC, the Joint Venture or the Limited Partnership, to:

- 25 -

Daily Gazette Company
1001 Virginia Street, East
Charleston, WV 25301
Attn: Ms. Elizabeth E. Chilton, President
Facsimile: (304) 348-5180
And
Attn: Mr. Norman Watts Shumate III
Facsimile: (304) 348-1795

With a copy to:

Baker & Hostetler LLP
1050 Connecticut Avenue, N.W., Suite 1100
Washington, DC 20036
Attn: Lee H. Simowitz
Facsimile: (202) 861-1783

or such other addresses as DGHC, DGC, DGPC, the Joint Venture or the Limited Partnership
may from time to time designate.

I.      Announcements/Disclosures. The parties agree that, except as required by law,
and then only upon the maximum advance notice to the other parties which is practicable under
the circumstances, they will make no public announcement concerning this JOA and the
transactions contemplated hereby prior to the first mutually agreed upon announcement thereof
without the consent of the other parties as to the form, content, and timing of such announcement
or announcements.

J.      Headings. Titles, captions or headings contained in this JOA are inserted only as a
matter of convenience and for reference and in no way define, limit, extend or describe the scope
of this JOA or the intent of any provisions hereof.

K.      Governing Law. This JOA shall be construed and enforced in accordance with the
internal laws of the State of West Virginia.

L.      Modifications. This JOA shall be amended only by an agreement in writing and
signed by the party against whom enforcement of any waiver, modification or discharge is

- 26 -

sought (subject to any applicable contractual restrictions under the Joint Venture's financing arrangements).

M. <u>Specific Performance</u>. In addition to any other remedies the parties may have, each party shall have the right to enforce the provisions of this JOA through injunctive relief or by a decree or decrees of specific performance.

N. <u>No Third Party Beneficiaries</u>. Nothing in this JOA, express or implied, shall give to anyone other than the parties hereto (and the parties entitled to indemnification hereunder) and their respective permitted successors and assigns any benefit, or any legal or equitable right, remedy or claim, under or in respect of this JOA.

O. <u>Nature of Relationship</u>. Nothing contained in this JOA shall constitute the parties hereto as alter egos or joint employers or as having any relationship other than as specifically provided herein and in any other agreement to which they are subject. DGHC and CPC each will retain and be responsible for (and will indemnify the other parties, the Joint Venture and the Limited Partnership against) all of their respective debts, obligations, liabilities, and commitments which have not been expressly assumed by the Joint Venture pursuant to this JOA or the Limited Partnership, or for which the Joint Venture was not already liable under the Prior JVA.

O. <u>Survival</u>. The expiration or termination of this JOA shall not abrogate the rights and obligations of the parties under Section VII (B) or any other provision of this JOA that contemplates actions to be taken after the expiration or termination of this JOA.

P. <u>Dispute Resolution</u>. The terms of <u>Exhibit A</u> attached hereto, which include provisions related to the procedures pursuant to which the parties shall resolve any disputes,

claims or controversies arising under, out of or in connection with this JOA are incorporated herein by this reference as if set out herein in full.

*[Signatures next page.]*

60827386_1.DOCX

DAILY GAZETTE COMPANY

By:_____

Title:_____

DAILY GAZETTE HOLDING COMPANY, LLC

By: Daily Gazette Company, Sole Member

By:_____

Title:_____

CHARLESTON PUBLISHING COMPANY

By:_____

Title:_____

CHARLESTON NEWSPAPERS

By: Charleston Newspapers Holdings, L.P., General
Partner
By: Daily Gazette Holding Company, LLC, General
Partner
By: Daily Gazette Company, Sole Member

By:_____

Title:_____

DAILY GAZETTE PUBLISHING COMPANY,
LLC

By: Charleston Newspapers Holdings, L.P., Sole
Member
By: Daily Gazette Holding Company, LLC, General
Partner
By: Daily Gazette Company, Sole Member

By:_____

Title:_____

CHARLESTON NEWSPAPERS HOLDINGS, L.P.

By: Daily Gazette Holding Company, LLC, General
Partner
By: Daily Gazette Company, Sole Member

By:_____

Title:_____

**Exhibit A**
**to**
**Amended and Restated Joint Operating Agreement**

**Dispute Resolution**

      (a)     Any dispute, claim or controversy arising under, out of, in connection with or relating to this JOA, or any course of conduct, course of dealing, statements (oral or written), or actions of any party relating to this JOA, including any claim based on or arising from an alleged tort (each, a "Dispute"), shall be resolved solely in the following manner:

          (i)     Pre-arbitration procedures.

            (A)     Each party shall cause one of its senior officers to first meet with the other party's senior officer and attempt to resolve the Dispute by agreement.

            (B)     Failing resolution, either party may submit to the other party a written request for non-binding mediation. Within ten (10) business days after such written request is made, the parties shall attempt to agree on a single mediator. If the parties cannot agree on a mediator within such period, either party may proceed to implement the arbitration provisions of clause (a)(ii) below.

            (C)     Mediation shall take place at the place or places and at the time or times set by the mediator, but shall not be held in public. The rules of procedure, evidence and discovery with respect to any mediation shall be as directed by the mediator. Neither party may be represented at hearings before the mediator by an attorney but the parties may consult with counsel outside the hearing room and counsel may assist in preparing any written materials to be used in the mediation, including statements and briefs.

            (D)     The mediator shall facilitate communications between the parties and assist them in attempting to reach a mutually acceptable resolution of the Dispute by agreement. The mediator shall make no binding determinations, findings, or decisions.

            (E)     The mediator's expenses shall be borne equally by the parties.

            (F)     At any point in the mediation process after the initial meeting with the mediator, either party may declare in writing that an impasse exists, and thereafter either party may proceed to implement the arbitration provisions of clause (a)(ii) below. If the parties have not resolved their dispute pursuant to the provisions of this clause (a)(i) within thirty (30) days after appointment of the mediator, the parties shall immediately proceed to implement the arbitration provisions of clause (a)(ii) below.

          (ii)     Arbitration.

            (A)     All Disputes between the parties that are not resolved under clause (a)(i) above shall be finally resolved by arbitration in accordance with the rules of JAMS (or its successor) described below, subject to the limitations of this clause (a)(ii).

            (B)     Except as provided in clause (a)(ii)(C), with respect to a Dispute in which the claim, counterclaim or amount in controversy does not exceed Two Hundred Fifty Thousand Dollars ($250,000) (a "Minor Dispute"), a single arbitrator shall decide the Minor Dispute in accordance with the JAMS Streamlined Arbitration Rules and Procedures then in

effect (the "Streamlined Rules"). In the event the parties are unable to agree upon an arbitrator, the arbitrator shall be appointed by JAMS under the Streamlined Rules. The arbitrator shall determine the Minor Dispute in accordance with the terms of this JOA and the laws designated in Section VII K of the JOA and shall have authority to render a maximum award of Two Hundred Fifty Thousand Dollars ($250,000), including all damages of any kind and costs, fees and the like.

(C)     With respect to a Dispute in which (x) the claim, counterclaim or amount in controversy exceeds Two Hundred Fifty Thousand Dollars ($250,000), or (y) the resolution of the Dispute may give a party a right to terminate this JOA ("Major Dispute"), any such Major Dispute shall be decided by a majority vote of three arbitrators. In the event the parties are unable to agree on the three arbitrators, the three arbitrators shall be appointed by JAMS under the JAMS Comprehensive Arbitration Rules and Procedures then in effect (the "Comprehensive Rules"). The three arbitrators shall determine the Major Dispute in accordance with the terms of this JOA and the laws designated in Section VII K of this JOA. The majority of the three arbitrators may grant any award, remedy or relief ("Award") that they deem just and equitable and within the scope of this JOA. The majority of the arbitrators may also grant such ancillary relief as is necessary to make effective the Award, including injunctive relief and/or specific performance. In all arbitration proceedings in connection with a Major Dispute, the arbitrators shall make specific, written findings of fact and conclusions of law. In all Major Disputes, the parties shall, in addition to the limited statutory right to seek vacation or modification of any Award pursuant to applicable law, have the right to seek vacation or modification of any Award that is based in whole, or in part, on an incorrect or erroneous ruling of law by appeal to an appropriate court having jurisdiction; provided, however, that any application for vacation or modification of an Award based on an incorrect ruling of law must be filed in a court having jurisdiction pursuant to clause (c) below within thirty (30) days from the date the Award is rendered. The findings of fact made by the arbitrators shall be binding on all parties and shall not be subject to further review except as otherwise allowed by applicable law.

(D)     The non-prevailing party, as determined by the arbitrator or arbitrators, shall be required to pay all of the arbitrator's fees and shall reimburse the prevailing party for any advances made by such party in respect of such fees.

(E)     The arbitrator(s) shall not have the power to award (i) damages inconsistent with this JOA or (ii) punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or in any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrator(s) have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter under the law designated in Section VII K of this JOA.

(F)     The arbitrator(s) shall have the authority to order the parties to produce documents or things for inspection and to provide appropriate discovery to each other, including the depositions of witnesses and the exchange of expert reports.

(G)     Neither the parties nor any arbitrator may disclose the existence, content or results of the arbitration, except as necessary to enforce an Award or comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written

notice to all other parties and shall afford these parties a reasonable opportunity to protect their interests.

(H)     Except as otherwise provided in clause (a)(ii)(C) above, the result of the arbitration will be binding on the parties, and judgment on the arbitrator's Award may be entered in a court designated in clause (c) below.

(I)     At the request of either party, arbitration proceedings shall include an oral hearing for the presentation of oral testimony and oral argument. Written presentations may also be received. The parties shall have the right to cross-examine witnesses, if requested. The arbitrator(s) shall have the authority to administer oaths and to issue orders requiring the presence of witnesses at the hearing if consistent with the law designated in Section VII K of this JOA, or to apply to a court designated in clause (c) below to issue such orders.

(J)     All arbitration hearings will be commenced within sixty (60) days of demand for arbitration by any party, provided, upon a showing of cause, the arbitrator or arbitrators may extend the commencement of such hearing for up to an additional thirty (30) days.

(b)     Limitations on Arbitration Requirement.

(i)     No provision of, nor the exercise of any rights under, this JOA regarding arbitration shall limit the right of either party to join the other party in litigation in the event of any litigation or proceeding commenced by any third party against a party to this JOA in which the other party is an indispensable party or potential third party defendant (e.g., where such other party may be obligated to indemnify the defendant in such third party action).

(ii)     No provision of, nor the exercise of any rights under, this JOA regarding arbitration shall limit the right of either party to seek provisional or ancillary judicial remedies with respect to any Dispute, such as preliminary injunctive relief, sequestration, attachment, garnishment, or the appointment of a receiver from a court having jurisdiction before, during or after the pendency of any arbitration. The institution and maintenance of an action for such judicial remedies shall not constitute a waiver of the right of any party, including the claimant in such action, to submit to arbitration nor render inapplicable the compulsory arbitration provisions hereof.

(iii)     Nothing in this JOA shall be deemed to limit applicability of any otherwise applicable statutes of limitation and any waivers contained in this JOA. No provision in this Exhibit regarding submission to jurisdiction and/or venue in any court is intended or shall be construed to be in derogation of the provisions in this Exhibit for arbitration of any Dispute.

(c)     WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDING RELATING TO ANY AWARD OR ANY ACTION, INCLUDING A SUMMARY OR EXPEDITED PROCEEDING, TO COMPEL ARBITRATION OF ANY DISPUTE TO WHICH THIS EXHIBIT APPLIES, AND FOR ANY OTHER MATTER SO DESIGNATED IN THIS EXHIBIT, EACH PARTY IRREVOCABLY (1) CONSENTS AND SUBMITS TO THE EXCLUSIVE JURISDICTION OF ANY UNITED STATES FEDERAL COURT OR WEST VIRGINIA STATE COURT SITTING IN THE CITY OF CHARLESTON IN THE STATE OF WEST VIRGINIA, (2) WAIVES ANY OBJECTION THAT IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH COURT, (3) WAIVES ANY CLAIM THAT ANY SUCH SUIT,

ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM, (4) WAIVES THE RIGHT TO OBJECT, WITH RESPECT TO ANY SUCH CLAIM, SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT, THAT SUCH COURT DOES NOT HAVE JURISDICTION OVER THE PARTY, AND (5) WAIVES ALL RIGHT TO TRIAL BY JURY.

# PUT/CALL AGREEMENT

PUT/CALL AGREEMENT, dated as of _____ (the "**Effective Date**"), among DAILY GAZETTE HOLDING COMPANY, LLC, a limited liability company organized under the laws of the State of Delaware ("**DGHC**"); CHARLESTON NEWSPAPERS HOLDINGS, L.P., a limited partnership organized under the laws of the State of Delaware (the "**Limited Partnership**"); and _____, a _____ (the "**Class B Partner**").

## RECITALS

WHEREAS, the parties desire to enter into this Agreement to set forth certain agreements with respect to the Class B Partner's ownership of its Class B Limited Partner Units, including put rights and call rights;

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements set forth herein, the parties agree as follows:

## ARTICLE I
## DEFINITIONS

1.1  Definitions.  The following terms used in this Agreement have the meanings given such terms in this Section 1.1:

"**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with such first-named Person.

"**Agreement**" means this Put/Call Agreement, as it may be amended, restated, modified or supplemented from time to time in accordance with its terms.

"**Buyer**" has the meaning given such term in Section 3.1(a).

"**Call**" has the meaning given such term in Section 5.1(b).

"**Call Notice**" has the meaning given such term in Section 5.1(b).

"**Class B Limited Partner**" has the meaning given such term in Section 1.1.12 of the Limited Partnership Agreement.

"**Class B Limited Partner Unit**" has the meaning given such term in Section 1.1.14 of the Limited Partnership Agreement.

"**CPC**" means Charleston Publishing Company, a Delaware corporation.

"**DGC**" means Daily Gazette Company, a corporation organized under the laws of the State of West Virginia.

"**DGHC**" has the meaning given such term in the Preamble.

"**Drag-Along Notice**" has the meaning given such term in Section 4.1(a).

"**Drag-Along Right**" has the meaning given such term in Section 4.1(a).

"**Election Notice**" has the meaning given such term in Section 6.1.

"**Fair Market Value of the Partnership**" has the meaning given such term in Section 5.2.3 of the Limited Partnership Agreement.

"**General Partner**" means DGHC and any successor General Partner.

"**General Partner Unit**" has the meaning given such term in Section 1.1.18 of the Limited Partnership Agreement.

"**JOA**" means the Second Amended and Restated Joint Operating Agreement dated as of the date hereof, by and among DGC, DGHC, the Joint Venture, the Limited Partnership, Daily Gazette Publishing Company, LLC, a Delaware limited liability company, and CPC.

"**Joint Venture**" means Charleston Newspapers, a West Virginia unincorporated joint venture.

"**Limited Partnership Agreement**" means that certain Amended and Restated Limited Partnership Agreement for Charleston Newspapers Holdings, L.P. dated as of _____, 2009, by and among DGHC and CPC, as such agreement may be amended, restated, modified or supplemented from time to time in accordance with its terms.

"**New Units**" means any Units offered by the Limited Partnership after the date of this Agreement.

"**Partner**" means any Person admitted as a Partner of the Limited Partnership in accordance with the provisions of the Limited Partnership Agreement.

"**Permitted Transferee**" means any other Person that directly or indirectly succeeds to any or all of its Class B Limited Partner Units in accordance with the provisions of this Agreement and Article VI of the Limited Partnership Agreement and is admitted as a Partner in accordance with the provisions of Article VI of the Limited Partnership Agreement.

"**Person**" means any individual, general partnership, limited partnership, corporation, limited liability company, limited liability partnership, joint venture, trust, business

2

trust, cooperative, association, governmental agency or a division or subdivision of any of the foregoing, and the heirs, executors, administrators, legal representatives, successors and assigns of such Person where the context so permits.

"**Pro Rata Portion**" means the Class B Partner's Percentage Interest in the Limited Partnership (as defined in the Limited Partnership Agreement).

"**Residual Class B Partner Percentage**" means, as of any date, the percentage of the aggregate distributions by the Limited Partnership to the General Partner and the Class B Partner that the Class B Partner would be entitled to receive under Section 7.3 of the Limited Partnership Agreement if (i) the Limited Partnership were to sell its assets at the Fair Market Value of the Partnership, (ii) income, gain, loss and deduction arising from such sale were allocated among the Partners in accordance with Section 5.2.3 of the Limited Partnership Agreement, but without giving effect to any allocation of income or gain attributable to the Tax Gross-Up Amount (as defined in the Limited Partnership Agreement), and (iii) the Limited Partnership were then liquidated on such date, taking into account all unrealized appreciation or decline in value of the assets of the Limited Partnership, and assuming all reserves were distributed.

"**Subsidiary**" means any Person (including the Joint Venture) that is controlled by the Limited Partnership.

"**Tax-Adjusted Residual Class B Partner Percentage**" means, as of any date, the percentage of the aggregate distributions by the Limited Partnership to the General Partner and the Class B Partner that the Class B Partner would be entitled to receive under Section 7.3 of the Limited Partnership Agreement if (i) the Limited Partnership were to sell its assets at the Fair Market Value of the Partnership, (ii) income, gain, loss and deduction arising from such sale were allocated among the Partners in accordance with Section 5.2.3 of the Limited Partnership Agreement, and (iii) the Limited Partnership were then liquidated on such date, taking into account all unrealized appreciation or decline in value of the assets of the Limited Partnership, and assuming all reserves were distributed.

"**Taxes**" means any and all taxes, fees, duties, tariffs, imposts and other charges of any kind imposed by any government or taxing authority, including, without limitation: federal, state, local, or foreign income, gross receipts, windfall profits, severance, property, ad valorem, sales, use, license, excise franchise, capital, transfer, recordation, employment, withholding, or other tax or governmental assessment.

"**Tax Interest**" means any interest, additions, or penalties with respect to Taxes and any interest in respect of such additions or penalties.

"**Unit**" means an undivided share of the interests in the Limited Partnership of all the Partners, which include the General Partner Units and Class B Limited Partner Units.

"**Unpaid Tax Liabilities**" means the sum of (i) all unpaid Transfer Tax Liabilities, plus (ii) all unpaid Taxes of the Class B Partner due and owing, (but, in the case of

any Tax attributable to income or gain allocated to the Class B Partner by the Limited Partnership, only to the extent that such Tax would have been paid by the Class B Partner if the Class B Partner had used the full amount of all distributions received by it from the Limited Partnership after such Tax became due and payable to pay such Tax and all other Taxes arising thereafter), plus Tax Interest attributable thereto.

ARTICLE II
RESTRICTION ON TRANSFER

2.1     Restriction on Transfer of Class B Limited Partner Units.

(a)     Permitted Transfer. Except as otherwise specifically provided in Section 2.1(c), the Class B Partner shall have the right to sell, exchange, transfer, pledge, hypothecate, assign or otherwise dispose of (any of the foregoing transactions referred to herein as a "**Transfer**") all or any part of its Class B Limited Partner Units to any Person.

(b)     Transfer to an Affiliate. The Class B Partner shall be permitted to Transfer its Class B Limited Partner Units to an Affiliate of the Class B Partner and to assign its Class B Limited Partner Units and its rights under this Agreement as collateral security to Persons extending financing to such Limited Partner or any of their Affiliates (and such Persons may at any time foreclose on such security interest).

(c)     Restriction on Transfer. Notwithstanding anything contained in Sections 2.1(a) or 2.1(b) to the contrary, the Class B Partner shall not have the right to Transfer all or any part of its Class B Limited Partner Units to any Person that is, or that is an Affiliate of a Person that is, a publisher of a general circulation daily newspaper (other than a newspaper published by the Joint Venture) whose principal newsroom is located in Kanawha County, West Virginia, or Putnam County, West Virginia; provided, however, that the foregoing restriction shall not apply to a publisher of a general circulation daily newspaper with a circulation market share in Kanawha and Putnam Counties of 5% or less. Any Transfer that is made in violation of this Section 2.1(c) shall not be permitted and shall be null and void for all purposes.

(d)     Transfer Tax Liabilities. Upon a Transfer of any Class B Limited Partner Units by the Class B Partner pursuant to this Section 2.1, the Class B Partner and/or the transferee of such Class B Limited Partner Units shall be liable for all Taxes and Tax Interest, resulting from such Transfer ("**Transfer Tax Liabilities**") and shall not be entitled to receive any tax distributions under the Limited Partnership Agreement in respect thereof (provided that this Section 2.1(d) shall not affect the Class B Partner's rights to receive distributions in accordance with the Limited Partnership Agreement).

(e)     Transfer in Compliance with the Limited Partnership Agreement; Agreement to be Bound by this Agreement. No Transfer may be made pursuant to this Section 2.1 unless such Transfer is also made in accordance with Article VI of the Limited Partnership Agreement and, without limiting the generality of the foregoing, the transferee of any Class B Limited Partner Units pursuant to this Section 2.1, if not already a party to this Agreement, shall execute and deliver an agreement to the General Partner by which it agrees to become a party to

4

this Agreement, assume all of the obligations hereunder of its transferor with respect to the Class B Limited Partner Units transferred to it and be bound by the terms and conditions hereof in the same manner as the transferor with respect to such Units. Without limiting the generality of the foregoing, any and all Class B Limited Partner Units transferred pursuant to this Section 2.1 shall remain subject to, and shall enjoy the rights under, the Tag-Along Right, Drag-Along Right, Put and Call provisions set forth in Articles III, IV and V hereof and the Class B Limited Partner shall continue to have the Class B Partner Board Right set forth in Article VII hereof and the Limited Partnership Agreement. No Transfer may be made pursuant to this Section 2.1 unless such Transfer is also made in accordance with all applicable laws, including federal and state securities laws.

## ARTICLE III
## TAG-ALONG RIGHTS

3.1    Tag-Along Rights

(a)    If the General Partner proposes to Transfer any General Partner Units ("**Transferor Units**"), to one or more Persons who is not an Affiliate of the General Partner (each such Person, a "**Buyer**"), then, as a condition to such transfer, the General Partner shall cause the Buyer to include an offer (the "**Tag-Along Offer**") to the Class B Partner to purchase from the Class B Partner, at the option of the Class B Partner, that number of Class B Limited Partner Units as determined in accordance with Section 3.1(b), on the same terms and conditions as are applicable to the Transferor Units (with the portion of the purchase price payable to the Class B Partner being the aggregate amount of the purchase price for all Units included in such sale multiplied by the Tax-Adjusted Residual Class B Partner Percentage). The General Partner shall provide a written notice (the "**Tag-Along Notice**") of the Tag-Along Offer to the Class B Partner, which may accept the Tag-Along Offer by providing a written notice of acceptance of the Tag-Along Offer to the General Partner within thirty (30) days of the delivery of the Tag-Along Notice. Subject to Section 3.1(e), if the Class B Partner fails to accept a Tag Along Offer within thirty (30) days of delivery of the Tag-Along Notice, the Class B Partner shall cease to have any rights hereunder with respect to such Tag-Along Offer.

(b)    The Class B Partner shall have the right (a "**Tag-Along Right**") to sell pursuant to the Tag-Along Offer the percentage of its Class B Limited Partner Units then held equal to the percentage of General Partner Units proposed to be sold by the General Partner (which percentage of General Partner Units may be reduced in the sole discretion of the General Partner and the Buyer).

(c)    The Class B Partner's Tag-Along Right shall not apply to any (i) pledge by the General Partner of Units for security purposes under any bona fide loan transaction; (ii) Transfer of Units pursuant to a foreclosure action under any bona fide loan transaction; or (iii) Transfer of Units by the General Partner to an Affiliate. If the General Partner Transfers any General Partner Units to an Affiliate of the General Partner, such Affiliate transferee shall become a party to and be bound by the terms of this Agreement to the same extent as the General Partner.

(d)     If the Class B Partner fails to accept a Tag-Along Offer within thirty (30) days of delivery of the Tag-Along Notice, the Buyer shall have one hundred twenty (120) days, commencing on the thirtieth (30th) day after delivery of the Tag-Along Notice to the Class B Partner, in which to purchase on terms no more favorable to the transferor than the terms set forth in the Tag-Along Offer from the General Partner the number of Transferor Units with respect to which the Tag-Along Notice was delivered. If such purchase and sale is not consummated on terms no more favorable to the transferor than the terms set forth in the Tag-Along Offer within such one hundred twenty (120) day period, any Transfer of the Transferor Units shall again be subject to the provisions of this Section 3.1.

(e)     The provisions of this Section 3.1 shall apply to a sale of any membership interest in the General Partner to the same extent as such provisions apply to a sale of Units by the General Partner.

ARTICLE IV
DRAG-ALONG RIGHTS

4.1     Drag-Along Rights. In the event the General Partner proposes to Transfer all of its General Partner Units for cash, in a single transaction or a series of related transactions, to a Person that is not an Affiliate of the General Partner, the General Partner shall have the right (the "**Drag-Along Right**") to cause the Class B Partner to sell all of its Class B Limited Partner Units to such Person on the same terms and conditions as the General Partner proposes to Transfer its General Partner Units (with the portion of the purchase price payable to the Class B Partner being the aggregate amount of the purchase price for all Units included in such sale multiplied by the Tax-Adjusted Residual Class B Partner Percentage). The General Partner may exercise its Drag-Along Right by giving written notice of such exercise (the "**Drag-Along Notice**") to the Class B Partner not fewer than ten (10) days prior to the consummation of the Transfer that is the subject of the Drag-Along Right. The Drag-Along Notice shall contain a copy of any definitive documentation pursuant to which Transfer is to be made and will state the name and address of the purchaser and the anticipated closing date of such Transfer. Upon delivery of the Drag-Along Notice, the Class B Partner shall be obligated to Transfer and deliver its Class B Limited Partner Units on the terms and conditions applicable to the Transfer and shall use commercially reasonable efforts to cooperate in the Transfer and take all necessary actions to enter into appropriate Transfer or transaction documents. The Class B Partner's indemnification obligations under the transaction documents governing a Transfer pursuant to this Section 4.1 shall be limited to the amount of any portion of the proceeds paid for the Class B Limited Partner Units sold in such transaction that is held in escrow for such purpose and not paid to the Class B Partner, such transaction documents shall not require the Class B Partner to make any representations other than those with respect to the Class B Partner's ownership of and its ability to Transfer the Class B Limited Partner Units to be sold in such transaction and any indemnification obligations shall be limited to breach of such representations only.

6

5.1    Put and Call Rights.

(a)    Class B Partner Put Right. Upon the cessation of the publication of The Charleston Daily Mail, the Class B Partner shall be required to sell to the General Partner (or an Affiliate or designee thereof) and the General Partner (or an Affiliate or designee thereof), shall be required, subject to the terms and conditions set forth in this Agreement, to purchase from the Class B Partner all, but not less than all, of the Class B Limited Partner Units. Additionally, at any time from and after the termination of the JOA by lapse of time or otherwise and/or dissolution and/or termination of the Joint Venture or upon the occurrence of any event which constitutes or results in a Change of Control (as defined below) of the Joint Venture, the Class B Partner shall have the right to sell to the General Partner (or an Affiliate or designee thereof) and the General Partner (or an Affiliate or designee thereof), shall be required, subject to the terms and conditions set forth in this Agreement, to purchase from the Class B Partner all, but not less than all, of the Class B Limited Partner Units. The obligation or right to sell and obligation to buy set forth in the preceding two sentences shall be referred to herein as the "**Put**". With respect to the Put described in the second sentence of this Section 5.1(a), if the Class B Partner elects to exercise the Put, it shall send written notice thereof to the General Partner (the "**Put Notice**"). The General Partner's designation of an Affiliate or other designee to purchase the Class B Limited Partner Units in connection with the exercise of the Put will not relieve the General Partner of its obligations hereunder. For purposes of this Section, "Change of Control" means any event, transaction or occurrence as a result of which DGC ceases to control the General Partner, and "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.

(b)    General Partner Call Right. At any time from and after the termination of the JOA by lapse of time or otherwise and/or the dissolution and/or termination of the Joint Venture, the General Partner (or an Affiliate or designee thereof) shall have the right to purchase from the Class B Partner, and the Class B Partner shall be required, subject to the terms and conditions set forth in this Agreement, to sell to the General Partner (or an Affiliate or designee thereof), all, but not less than all, of the Class B Limited Partner Units (such right to purchase, the "**Call**"). If the General Partner elects to exercise the Call, it shall send written notice thereof to the Class B Partner (the "**Call Notice**").

(c)    Purchase Price. The purchase price to be paid to the Class B Partner upon the exercise of the Put or Call (the "**Put/Call Purchase Price**") shall be equal to (A) the amount that would be distributed to the Class B Partner under Section 7.3 of the Limited Partnership Agreement if the Limited Partnership were to sell its assets on the Put/Call Closing Date for the Fair Market Value of the Partnership and the income, gain, loss and deduction arising from such sale were allocated among the Partners in accordance with Section 5.2.3 of the Limited Partnership Agreement, but without giving effect to any allocation of income or gain attributable to the Tax Gross-Up Amount (as defined in the Limited Partnership Agreement), and the Limited Partnership were then liquidated in accordance with Article VII of the Limited Partnership

7

Agreement on the Put/Call Closing Date, minus (B) the amount of any Unpaid Tax Liabilities or other outstanding liabilities of the Class B Partner (other than liabilities for Taxes and Tax Interest). The Fair Market Value of the Partnership shall be determined as of the Put/Call Closing Date by mutual agreement of the General Partner and the Class B Partner or by appraisals in accordance with the terms hereof. In the event the General Partner and the Class B Partner do not agree on the Fair Market Value of the Partnership within twenty days, then within fifteen days of the expiration of such twenty day period (or such longer period as the General Partner and the Class B Partner mutually agree), each of the General Partner and the Class B Partner shall select a nationally recognized appraiser with experience in the newspaper industry to prepare, using the methodology described in Exhibit A attached hereto, a written appraisal setting forth such appraiser's determination of the Fair Market Value of the Partnership. If either the General Partner and the Class B Partner fail to so appoint an appraiser within such fifteen day period, then its right to do so shall lapse and the appraisal made by the one appraiser who is timely appointed shall be the Fair Market Value of the Partnership. If two appraisals are made, unless the higher of the two appraisals is more than 110% more than the lower appraisal, the Fair Market Value of the Partnership will be the average of the two appraisals, and if the higher of the two appraisals is more than 110% more than the lower of the appraisals, the General Partner and the Class B Partner shall jointly select a third appraiser, and the Fair Market Value will be the average of the two of the three appraisals that are closest together in amount. All appraisals will be made within twenty days of appointment of such appraiser and must separately identify the amount of each of the items described in clauses (i) through (vi) of Section 5.2.3(b) of the Limited Partnership Agreement. A written notice of the results of each such appraisal shall be given to the General Partner and the Class B Partner. The General Partner and the Class B Partner will each pay the fees of the appraiser selected by it, and the General Partner and the Class B Partner will share equally the fees of the third appraiser, if any. The General Partner and each Member will cooperate fully with each appraiser's attempt to determine the Fair Market Value of the Partnership.

(d)     Closing. The closing of the transaction pursuant to the exercise of the Put or Call, as the case may be, shall take place at the principal offices of the Limited Partnership no later than the thirtieth (30th) day following the final determination of the Put/Call Purchase Price; provided that such date shall be extended as necessary and for so long as necessary to permit the parties to comply with applicable law to obtain all regulatory approvals, if any, necessary to consummate such transaction (such 30th day, as it may be extended, the "**Put/Call Closing Date**"). The General Partner shall be responsible (solely at the General Partner's expense) for obtaining all approvals and consents necessary to permit the General Partner and Class B Partner to consummate such transactions (other than any such approvals or consents that are unique to the Class B Partner). Each party agrees to use its commercially reasonable efforts to cooperate in obtaining any regulatory approvals necessary to consummate such transaction as promptly as possible. If the closing of the transaction pursuant to the exercise of the Put has not occurred by the tenth (10th) day after the Put/Call Closing Date, the General Partner shall pay to the Class B Partner at the closing interest in an amount equal to 14.5% of the Put/Call Purchase Price accruing daily on the basis of a 360-day year and compounding at the end of each 90-day period after the Put/Call Closing Date. At the closing of the Put or Call, as the case may be, the General Partner shall pay the Put/Call Purchase Price and any interest accrued thereon to the Class B Partner in cash or immediately available funds and the Class B Partner shall deliver

instruments, in form and substance reasonably satisfactory to the General Partner, assigning all of its interest in the Class B Limited Partner Units to the General Partner free and clear of all liens, claims and encumbrances of any nature whatsoever (other than those arising under this Agreement, the Limited Partnership Agreement or the JOA or in favor of any lender(s) to the Limited Partnership or any of its Subsidiaries) against payment of the Put/Call Purchase Price therefor.

ARTICLE VI
PREEMPTIVE RIGHTS

6.1     Class B Partner Preemptive Rights. Prior to issuing any New Units to any Person ("**New Unit Offerees**"), the Limited Partnership shall offer (the "**New Unit Offer**") the Class B Partner an opportunity to purchase all or a portion of its Pro Rata Portion of such New Units upon the same terms and conditions offered to the New Unit Offerees, The Limited Partnership shall make such New Unit Offer by providing the Class B Partner with notice (the "**New Unit Notice**") setting forth: (i) the Class B Partner's Pro Rata Portion of such New Units; (ii) the consideration to be paid for each of the New Units; and (iii) all other material terms of such New Units. The Class B Partner may elect to accept the New Unit Offer by delivering written notice of its acceptance to the Limited Partnership within thirty (30) days after delivery of the New Unit Notice (the "**Election Notice**") setting forth the number of New Units the Class B Partner wishes to purchase. If the Class B Partner elects to purchase all or a portion of its Pro Rata Portion of such New Units, the sale thereof shall be consummated on the closing date applicable to all New Unit Offerees. In the event the Class B Partner elects not to exercise its right pursuant to this Section 6.1, fails to timely give an Election Notice or fails to purchase the New Units allocated to it at the closing designated therefor by the Limited Partnership, the Class B Partner shall cease to have any rights hereunder with respect to such New Unit Offer, provided that if there is any material change to the terms of the New Unit Offer following such non-exercise or failure, the Class B Partner's rights under this Section 6.1 will be reinstated.

6.2     Issuance of New Units. In the event the Limited Partnership issues any New Units for no consideration or for consideration which is less than the fair market value of such New Units at the time of sale (as mutually determined by the General Partner and the Class B Partner or if the General Partner and Class B Partner cannot agree, pursuant to an appraisal process similar to the process set forth in Section 5.1(c) and at the Limited Partnership's expense) and the New Units are entitled to a portion of the net equity value of the Limited Partnership on liquidation and/or distributions under the Limited Partnership Agreement, then the Limited Partnership Agreement shall be amended to change the terms of the Class B Limited Partner Units so that, after giving effect to such amendment, the value of the net equity of the Limited Partnership and distributions by the Limited Partnership to which the Class B Partner is entitled by virtue of its ownership of Class B Limited Partner Units is the same as the value of the net equity of the Limited Partnership and distributions by the Limited Partnership to which the Class B Partner was entitled prior to giving effect to such issuance and such amendment (the intention of the parties being such amendment will afford the Class B Partner a benefit of the type afforded by a customary weighted-average antidilution adjustment). The parties will act in good faith to agree upon and execute such amendment to the Limited Partnership Agreement, which shall also provide for additional distributions to be paid to the Class B Partner on the date such

9

amendment becomes effective in order to give effect to the terms of such amendment with respect to distributions (if any) made by the Limited Partnership after such issuance but prior to such amendment becoming effective.

6.3     Termination of Preemptive Rights. The Class B Partner's preemptive rights pursuant to this Article VI shall terminate upon the completion of a successful underwritten public offering by the Limited Partnership (or any corporate successor thereto).

6.4     Application of Article VI to Joint Venture. The provisions of this Article VI shall apply mutatis mutandis if the Joint Venture or any other Subsidiary of the Limited Partnership issues any new equity interests (other than any such equity interest issued to the Limited Partnership or another Subsidiary or the Limited Partnership).

## ARTICLE VII
## DGHC BOARD REPRESENTATION

7.1     Class B Partner Board Representation. The Class B Partner (together with any other Class B Limited Partners) shall have the right to appoint two (2) members to the board of managers of DGHC or such greater number as required by Section 5(b)(ii) of the Operating Agreement of DGHC (the "**Class B Partner Board Right**"), which board of managers shall be governed by the Limited Partnership Agreement and the Operating Agreement of DGHC attached hereto as Exhibit B. The board of managers shall consist of up to five individual managers and in no event may the board of managers consist of more than five managers without the consent of the managers appointed by the Class B Partner(s) pursuant to Section 5(b) of the Operating Agreement of DGHC; provided, however, that in no event may the board of managers consist of more than five managers unless not fewer than forty percent (40%) of the managers are appointed by the Class B Partner(s) pursuant to Section 5(b) of the Operating Agreement of DGHC. If there is more than one Class B Limited Partner, then the Class B Partner Board Right will be vested solely in the Class B Limited Partner that supervises editorial and reportorial functions of the The Charleston Daily Mail pursuant to Section 9.1 of the Limited Partnership Agreement. In no event may the Class B Limited Partner(s) appoint as members to the board of managers of DGHC any person who is, at the time of his or her appointment, an employee of the Joint Venture, DGC, DCHC, the Limited Partnership or Daily Gazette Publishing Company, LLC.

## ARTICLE VIII
## MISCELLANEOUS

8.1     Registration Rights. The parties agree that prior to the consummation of any public offering of the Limited Partnership (or any corporate successor thereto), the parties will agree on a registration rights agreement which will include one demand registration and an unlimited number of piggyback registrations with respect to the Class B Partner's securities of the Limited Partnership (or any corporate successor thereto), in each case, at the Limited Partnership's (or any corporate successor thereto's) expense, containing customary terms and conditions and otherwise in form and substance reasonably acceptable to the parties.

10

8.2    Assignment. This Agreement shall be binding upon and inure only to the benefit of and be enforceable against the parties hereto and their respective permitted successors and assigns. Nothing in this Agreement, express or implied, is intended to confer upon any Person, other than the parties hereto and their respective permitted successors and assigns, any rights or remedies under or by reason of this Agreement. The Class B Partner may assign this Agreement and such party's rights hereunder to any Permitted Transferee hereunder. The General Partner may assign this Agreement and its rights hereunder to any of its Affiliates, to a successor General Partner or as collateral for a loan or other financing; provided that no such assignment shall release the General Partner from any obligation hereunder.

8.3    Amendment. This Agreement may not be amended except by a written instrument signed by the General Partner, the Limited Partnership and the Class B Partner.

8.4    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of West Virginia, without regard to its conflicts of law principles.

8.5    Notices. All notices and other communications given or made pursuant hereto shall be in writing and shall be deemed to have been duly given or made as of the date delivered if delivered by hand, by telecopier device or by overnight courier service to the parties at the following addresses:

| | |
|---|---|
| If to General Partner: | c/o Daily Gazette Company<br>1001 Virginia Street, East<br>Charleston, WV 25301<br>Attn: Ms. Elizabeth E. Chilton, President,<br>Facsimile: (304) 348-5180, and<br>Attn: Mr. Norman Watts Shumate III,<br>Facsimile: (304) 348-1795 |
| With A Copy to: | Edmondson + Blumenthal PLLC<br>12 Cadillac Drive, Suite 210<br>Brentwood, TN 37027<br>Attn: Steven E. Blumenthal<br>Facsimile: (615) 296-4600 |
| If to Class B Partner: | [insert notice information] |

8.6    Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an

acceptable manner to the end that transactions contemplated hereby are fulfilled to the greatest extent possible.

8.7     Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be an original, but all of which taken together shall constitute one and the same agreement.

8.8     Headings. The section headings used in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of any term or provision of this Agreement.

8.9     Integration. This Agreement (together with the Limited Partnership Agreement and the JOA) represents the entire understanding of the parties with reference to the matters set forth herein. This Agreement supersedes all prior negotiations, discussions, correspondence, communications and prior agreements among the parties relating to the subject matter herein.

*[Signatures follow on next page]*

IN WITNESS WHEREOF, the parties have caused this Put/Call Agreement to be duly executed as of the date first above written.

DAILY GAZETTE HOLDING COMPANY, LLC

By: Daily Gazette Company, its sole member

By: _____
       Name:
       Title:


CHARLESTON NEWSPAPERS HOLDINGS, L.P.

By: Daily Gazette Holding Company, LLC, its general partner

By: Daily Gazette Company, its sole member

By: _____
       Name:
       Title:


[insert name of Class B Partner]

By: _____
       Name:
       Title:


DAILY GAZETTE COMPANY (solely for the purposes of Article VII)

By: _____
       Name:
       Title:

## Exhibit A
## Appraisal Methodology

In determining the Fair Market Value, the appraiser will use the following methodology:

The appraiser shall determine the Fair Market Value of the Partnership based on the going concern value of the Partnership as of the relevant date. In determining the Partnership's going concern value, the appraiser (i) shall assume that the value of any business is the cash price at which the assets of such business as a going concern would change hands between a willing buyer and a willing seller (neither acting under compulsion) in an arms-length transaction, on terms and subject to conditions and costs applicable in the newspaper publishing industry, (ii) shall assume that all assets used in the operation of the business of the Partnership and its Subsidiaries, whether owned by or licensed to the Partnership or any of its Subsidiaries (and all other assets of any Affiliate of the Partnership that are used by the Partnership or any of its Subsidiaries), were entirely owned directly by the Partnership, and (iii) shall not take into account expenditures in respect of any management agreements entered into by the Joint Venture.

**Exhibit B**
**Operating Agreement of DGHC**

NEITHER THIS WARRANT NOR THE CLASS B LIMITED PARTNER UNITS TO BE ISSUED UPON EXERCISE HEREOF HAS BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"). NO SALE OR OTHER DISPOSITION OF THIS WARRANT OR THE CLASS B LIMITED PARTNER UNITS ISSUABLE UPON EXERCISE HEREOF MAY BE MADE WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT. THIS WARRANT IS ALSO SUBJECT TO CERTAIN ADDITIONAL TRANSFER RESTRICTIONS PROVIDED FOR HEREIN.

## CHARLESTON NEWSPAPERS HOLDINGS, L.P.

## WARRANT TO PURCHASE CLASS B LIMITED PARTNER UNITS INITIALLY CONSTITUTING A 20% PERCENTAGE INTEREST

This certifies that Charleston Publishing Company, a Delaware corporation ("Holder"), is entitled to subscribe for and purchase from Charleston Newspapers Holdings, L.P., a Delaware limited partnership (hereinafter, the "Partnership"), up to an aggregate number of duly authorized, validly issued, fully paid and nonassessable Class B Limited Partner Units equal to the Warrant Units Amount, at a purchase price per Class B Limited Partner Unit equal to the Warrant Price (as defined below), subject to the provisions and upon the terms and conditions hereinafter set forth. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to them in that certain Amended and Restated Limited Partnership Agreement for Charleston Newspapers Holdings, L.P. by and among Daily Gazette Holding Company, LLC, a Delaware limited liability company ("DGHC"), and Charleston Publishing Company (as it may be amended from time to time, the "Partnership Agreement").

The purchase price of each Class B Limited Partner Unit shall be the price per Class B Limited Partner Unit determined in accordance with Exhibit A attached hereto and set forth in an addendum to this Warrant executed by Holder and the Partnership (the "Warrant Price"). The maximum number of Class B Limited Partner Units to be issued upon exercise of this Warrant (as adjusted from time to time, the "Warrant Units Amount") shall be equal to the number of Class B Limited Partner Units that constitute a twenty percent (20%) Percentage Interest in the Partnership (subject to adjustment as provided below (as adjusted from time to time, the "Warrant Percentage Amount") as of the date of exercise. The term "Class B Units" shall mean, unless the context otherwise requires, the Class B Limited Partner Units and other property at the time receivable upon the exercise of this Warrant. The term "Warrant(s)" as used herein shall include this Warrant and any warrant(s) delivered in substitution or exchange therefor as provided herein.

### 1. Method of Exercise; Payment.

The purchase right represented by this Warrant may be exercised by Holder, in whole or in part, by:

    a. the surrender of this Warrant at the principal office of the Partnership located at

c/o Daily Gazette Company, 1001 Virginia Street, East, Charleston, WV 25301, Attn: Ms. Elizabeth Chilton, President, together with a written notice of Holder's election to exercise this Warrant, which notice shall specify the number of Class B Units (or the Percentage Interest of the Partnership) to be purchased;

b. the payment to the Partnership, by wire transfer of immediately available funds to an account designated by the Partnership, of an amount equal to the aggregate Warrant Price of the Class B Units being purchased;

c. if Holder is not already a party to the Partnership Agreement, the execution and delivery by Holder of an amendment to the Partnership Agreement (in a form prepared by Holder and reasonably acceptable to the General Partner) pursuant to which Holder will become a party to the Partnership as a Class B Limited Partner and agree to be bound by the terms and conditions of the Partnership Agreement (a "Partnership Amendment"); and

d. if Holder is not already a party to a put/call agreement in substantially the form attached to this Warrant as Exhibit B (a "Put/Call Agreement"), the execution and delivery by Holder of a Put/Call Agreement.

Class B Units purchased pursuant to this Warrant shall be uncertificated. Unless this Warrant has been fully exercised or has expired, a new Warrant representing the Class B Units with respect to which this Warrant shall not then have been exercised shall be issued to Holder as soon as practicable after each exercise of this Warrant, and in any event within thirty (30) days after the surrender of this Warrant. Each exercise of this Warrant shall be deemed to have been effected immediately prior to the close of business on the date on which items (a) and (b) above have been satisfied, and the person entitled to receive the Class B Units issuable upon such exercise shall be treated for all purposes as the holder of such Class B Units of record as of the close of business on such date.

2. **Certain Agreements.**

Upon surrender of this Warrant pursuant to Section 1:

a. the Partnership will cause the General Partner to immediately execute and deliver to Holder the Partnership Amendment executed and delivered by Holder pursuant to Section 1(c) above; and

b. the Partnership will (and the Partnership will cause the General Partner to) immediately execute and deliver to Holder the Put/Call Agreement executed and delivered by Holder pursuant to Section 1(d) above.

3. **Covenant of Non-Impairment.**

The Partnership will not, by amendment of the Partnership Agreement or through reorganization, consolidation, merger, dissolution, issue or sale of Partnership Interests or other securities, sale of assets or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Warrant, but will at all times in good faith assist in the carrying out of all such terms and in the taking of all such action as may be necessary or appropriate in order to protect the rights of Holder against dilution or other impairment.

2

## 4. Adjustment of Percentage Interest.

At the end of each of the 2010, 2011, 2012, 2013 and 2014 fiscal years of the Partnership, the Warrant Percentage Amount shall be subject to adjustment as follows:

    a. If the Daily Mail's percentage share of the Combined Circulation for the most-recently ended 12-month audit period exceeds the Daily Mail's percentage share for the immediately preceding 12-month audit period by more than one (1) percentage point, then the Warrant Percentage Amount will increase one (1) percentage point.

    b. If the Daily Mail's percentage share of the Combined Circulation for the most-recently ended 12-month audit period is more than one (1) percentage point lower than the Daily Mail's percentage share for the immediately preceding 12-month audit period, then the Warrant Percentage Amount will decrease one (1) percentage point.

For purposes of determining adjustments to be made pursuant to this Section 3, the terms set forth below shall have the meanings assigned to them below:

    i. "Daily Mail": The Charleston Daily Mail.

    ii. "Charleston Gazette": The Charleston Gazette.

    iii. "Daily Print Circulation": the average weekday paid print circulation of a newspaper as stated in the most recent 12-month audit conducted by the Audit Bureau of Circulations or other reputable third party media auditor.

    iv. "Combined Circulation": the sum of the Daily Print Circulation of the Daily Mail and the Charleston Gazette.

## 5. Term; Termination.

This Warrant may be exercised in whole or in part at any time and from time to time, on or after [insert date] and shall terminate three (3) years thereafter. Notwithstanding the foregoing, this Warrant shall terminate immediately upon the cessation of the publication of The Charleston Daily Mail.

## 6. No Partner Rights.

Holder shall not, solely by virtue hereof, be entitled to any rights of a partner of the Partnership prior to any exercise of this Warrant, and nothing contained in this Warrant shall be construed as imposing any obligation on Holder to purchase any Partnership Interest or as imposing any liabilities on Holder as a partner of the Partnership (prior to any exercise of this Warrant), whether such obligation or liabilities are asserted by the Partnership or by creditors of the Partnership.

## 7. Transfer.

This Warrant may not be sold, assigned, disposed, hypothecated, pledged or otherwise transferred in whole or in part; provided, however, (x) Holder may assign this Warrant to any of Holder's Affiliates, provided that such Affiliate agrees to be bound by the provisions of this Warrant and (y) Holder may assign its rights under this Warrant as collateral security to persons or entities extending financing to Holder or any of its Affiliates (and such persons or entities may at any time foreclose on such security interest). The term "Holder" as used herein shall include any transferee to whom this Warrant has been transferred in accordance with this Section 7. Any transfer or attempted transfer in violation of this Section 7 shall be null and void. The term "Affiliate" as used herein shall mean, with respect to any person or entity, any other person or entity directly or indirectly controlling or controlled by such person or entity or under direct or indirect common control with such person or entity.

## 8. Securities Act of 1933.

In addition to (and not in limitation of) the restrictions set forth in Section 6 above, Holder, by acceptance hereof, agrees that, absent an effective registration statement under the Securities Act of 1933, as amended (the "Securities Act"), covering the disposition of the Warrant or Class B Units issued or issuable upon exercise hereof, Holder will not sell or transfer any or all of such Warrant or Class B Units unless such sale or transfer will be exempt from the registration and prospectus delivery requirements of the Securities Act and an opinion of counsel reasonably satisfactory to the Partnership regarding such exemption is delivered to the Partnership. Holder consents to the Partnership's making a notation on its records in order to implement such restriction on transferability. Holder represents that it is an "accredited investor" within the meaning of Rule 501 under the Securities Act.

## 9. Remedies.

The Partnership stipulates that the remedies at law of Holder, in the event of any default or threatened default by the Partnership in the performance of or compliance with any of the terms of this Warrant, are not and will not be adequate and that, to the fullest extent permitted by law, such terms may be specifically enforced by a decree for the specific performance of any agreement contained herein or by an injunction against a violation of any of the terms hereof or otherwise.

## 10. Loss or Mutilation.

Upon receipt by the Partnership of evidence satisfactory to it (in the exercise of reasonable discretion) of the ownership of and the loss, theft, destruction or mutilation of this Warrant and (in the case of loss, theft, or destruction) of indemnity satisfactory to it (in the exercise of reasonable discretion), and (in the case of mutilation) upon surrender and cancellation thereof, the Partnership will execute and deliver in lieu hereof a new Warrant of like tenor.

4

**11. Successors.**

All the covenants and provisions of this Warrant shall bind and inure to the benefit of Holder and the Partnership and their respective successors and permitted assigns.

**12. Notices.**

All notices and other communications given pursuant to this Warrant shall be in writing and shall be deemed to have been given when personally delivered or when mailed by prepaid registered, certified or express mail, return receipt requested. Notices should be addressed as follows:

    a.  If to Holder, then to:

        Affiliated Media, Inc.
        101 W. Colfax Avenue, Suite 1100
        Denver, CO 80202
        Attention: Joseph J. Lodovic, IV, President

        With a copy (which shall not constitute notice) to:

        Hughes Hubbard & Reed LLP
        One Battery Park Plaza
        New York, New York 10004
        Attention: James Modlin

    b.  If to the Partnership, then to:

        Daily Gazette Company
        1001 Virginia Street, East
        Charleston, WV 25301
        Attention: Elizabeth E. Chilton, President and
                      Norman Watts Shumate III

        With a copy (which shall not constitute notice) to:

        Edmondson + Blumenthal PLLC
        12 Cadillac Drive, Suite 210
        Brentwood, TN 37027
        Attention: Steven E. Blumenthal

Such addresses for notices may be changed by any party by written notice to the other party pursuant to this Section 12.

5

### 13. Amendment.

This Warrant may be amended only by an agreement in writing signed by the Partnership and Holder.

### 14. Construction of Warrant.

Captions contained in this Warrant are inserted as a matter of convenience and in no way define the scope of this Warrant or the intent of any provision hereof. None of the provisions of this Warrant shall be for the benefit of or be enforceable by any creditor of the Partnership, any Partner or Holder. This Warrant, together with the exhibits attached hereto and the Partnership Agreement and the JOA, constitute the entire agreement between the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements (oral or written) and understandings pertaining thereto. In the event of any conflict between this Warrant and any other agreement, this Warrant shall control. The invalidity of any article, section, subsection, clause or provision of this Warrant shall not affect the validity of the remaining articles, sections, subsections, clauses or provisions hereof.

### 15. Governing Law.

This Warrant and the rights and obligations of the parties hereto shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its conflicts of law principles.

Dated as of [insert date]

**Charleston Newspapers Holdings, L.P.**

By:    Daily Gazette Company, General Partner

By:_____
    Elizabeth E. Chilton, President

60827389_2.DOCX

## Methodology for Determining Price
## per Class B Limited Partner Unit

The Warrant Price will be the appraised value of a Class B Limited Partner Unit as of the date of this Warrant, as determined promptly following the execution and delivery of this Warrant by a nationally-recognized appraiser with experience in the newspaper industry that is reasonably acceptable to both Daily Gazette Company and the Holder. Each of the following appraisers are hereby deemed to be "reasonably acceptable" to both Daily Gazette Company and the Holder:

Dirks, Van Essen & Murray

In determining the price per Class B Limited Partner Unit, the appraiser will use the following methodology:

The appraiser shall determine the fair market value of the Partnership based on the going concern value of the Partnership as of the relevant date, with the following adjustments. In determining the Partnership's going concern value, the appraiser (i) shall assume that the value of any business is the cash price at which the assets of such business as a going concern would change hands between a willing buyer and a willing seller (neither acting under compulsion) in an arms-length transaction, on terms and subject to conditions and costs applicable in the newspaper publishing industry, (ii) shall assume that all assets used in the operation of the business of the Partnership and its Subsidiaries, whether owned by or licensed to the Partnership or any of its Subsidiaries (and all other assets of any Affiliate of the Partnership that are used by the Partnership or any of its Subsidiaries), were entirely owned directly by the Partnership, and (iii) shall not take into account expenditures in respect of any management agreements entered into by the Joint Venture. The Warrant Price with respect to any Class B Limited Partner Unit shall be an amount equal to (x) the fair market value of the Partnership as of the date of this Warrant (as determined in accordance with the preceding sentence) multiplied by (y) the Percentage Interest in the Partnership represented by such Class B Limited Partner Unit as of the date of exercise of the Warrant.

## Exhibit B

## Form of Class B Units Put/Call Agreement

*[Attached]*